**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger**

**Civil Action No. 11-cv-00102-MSK-KLM**

**DANIEL MARTINEZ, JR.;
NATHAN MARTINEZ;
DANIEL MARTINEZ III; and
JONATHAN MARTINEZ,**

      **Plaintiff,**

**v.**

**CITY AND COUNTY OF DENVER,
JASON VALDEZ,
ROBERT MARTINEZ,
ROBERT MOTYKA,  and
BRYCE JACKSON.**

      **Defendants.**

_____

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
MOTIONS FOR SUMMARY JUDGMENT**

_____

      **THIS MATTER** comes before the Court pursuant to Defendant City and County of

Denver's ("Denver") Motion for Summary Judgment **(# 74)**, the Plaintiffs' response **(# 79)**, and

Denver's reply **(# 84)**; and Defendants Valdez, Martinez, Motyka, and Jackson's (collectively,

"the Officers") Motion for Partial Summary Judgment **(# 75)**, the Plaintiffs' response **(# 78)**, and

the Officers' reply **(# 83)**.

## **FACTS**

The Court briefly summarizes the pertinent facts here and elaborates as necessary in its analysis. As required by the summary judgment standard, where there are disputes in the record about a particular event, the Court recites the version most favorable to the Plaintiffs.

Prior to the events at issue, a neighbor of the Plaintiffs raised a concern to Denver police of heavy foot traffic around the Plaintiffs' home; the neighbor considered such traffic to be possible indicia or a drug or prostitution business being conducted out of the home. Although the Plaintiffs contend that investigation into police and public records would have revealed that the Plaintiffs had only recently moved into the home (and, correspondingly, that a more troublesome set of prior tenants had recently moved out), the police did not undertake any significant investigation into the matter, other than deciding to go to the home and speak to the occupants. The police went to the home at approximately 10:30 p.m. on January 27, 2009. Two officers, Officer Valdez and Officer Martinez, went to the front door of the residence; two more officers, Sergeant Motyka and Officer Jackson, took up positions further away.

Defendant Valdez knocked (the Plaintiffs characterized it as "pounded") on the door and identified himself as being with the Denver Police, instructing the Plaintiffs to open the door. Plaintiff Daniel Martinez Jr. ("Daniel Jr.")[1] struggled to unhook a bungee cord that secured the door, responding with "I'm trying" to the demands that he open the door. He finally released the

---

[1]      The Court's customary practice is to refer to parties and witnesses as "Mr." or "Ms." and their last name. Because all the Plaintiffs (and one of the Defendants) share a last name, the Court sets aside this practice for purposes of this Opinion. Without intending any disrespect to the Plaintiffs, the Court will refer to them by their first names when it is necessary to identify a particular individual Plaintiff.

bungee cord and began to open the door to the house, at which point the Defendant Officers "pushed" that door open and "rushed" into the house.

At this point, several events occurred either simultaneously or in rapid sequence. According to Daniel Jr., he and his son, Plaintiff Daniel Martinez III ("Daniel III"), who was standing behind him, were "rushed back" by the officers into the living room of the house. Daniel Jr. testified that he was physically taken by the arm and turned by one officer (subsequently revealed to be Officer Martinez), pushed towards the couch and told to get on his knees facing the wall. He was then handcuffed and taken outside to a patrol car.

Daniel III testified that he was sitting at a computer when he heard the pounding on the door. He followed Daniel Jr. to the door, but before he got to the door, the officers rushed in. He saw Daniel Jr. moving backwards, away from the door, and so backed up accordingly. He saw an officer make contact with Plaintiff Jonathan Martinez ("Jonathan"), who had come to the door after Daniel III. Daniel III reached out in an attempt to pull Jonathan toward him, in order to "get him out of the way." He saw the officer, who he identified as Defendant Valdez, take Jonathan by the shoulder, turn him around, and push him towards a wall. He then saw Officer Valdez had Jonathan's head pushed through a window. At that point, Daniel III recalls yelling "He's a minor, leave him alone." Seconds later, an officer (subsequently identified as Officer Jackson), placed Daniel III in a choke hold. The officer took Daniel III outside, and "slammed" him on the sidewalk, turned him onto his stomach, picked him up, put him in the snow, and began handcuffing him. At that time, Officer Valdez had already taken Jonathan outside and was handcuffing him as well. Daniel III observed that after Officer Valdez handcuffed Jonathan, he flipped Jonathan over onto his back and punched him in the stomach.

Plaintiff Nathan Martinez ("Nathan") was sitting in the living room and did not see the events at the door, but heard Daniel III (who had followed Daniel Jr. to the door) exclaim to the officers "You can't touch my brother, he's a minor," apparently referring to Jonathan, who had himself followed Daniel III to the door.  He saw an officer "shoving" Daniel Jr. backwards into the living room, and heard Daniel III repeat the instruction not to touch Jonathan.  Nathan stood up and attempted to go towards the hallway to the front door, repeating what he had heard Daniel III say.  At that point, a police officer (subsequently identified as Sergeant Motyka) punched Nathan in the mouth.  Nathan fell back on the couch, at which point the officer who punched him began to handcuff him.  Nathan demanded to speak to a sergeant, and the officer who punched him responded that he was a sergeant.  At some point, another officer entered the house with a video camera, stating that the police intended to individually interview each of the Plaintiffs.  Nathan was taken to another room and interrogated by two officers while being videotaped.  A portion of the recorded audio from that interrogation is included in the transcript of Nathan's deposition.  Nathan stated during the interrogation that he "tried to get in the middle" between Jonathan and one or more officers who were "pushing" Jonathan up against a window, but in his deposition, he denied both seeing Jonathan pushed up against a window and attempting to intervene.  Nathan was subsequently arrested and taken to jail.

Finally, Jonathan testified that the officers came through the door, forcing his father backwards.  As they passed, one officer (subsequently revealed to be Officer Valdez), "aggressively" grabbed Jonathan by the arm, turned him around, and "slammed" him into the wall.  The officer then pulled him back and again slammed him face first against a window,

breaking the glass.  The officer then took him outside, "slammed" him on the sidewalk face first, handcuffed him, and then turned him over and punched him in the stomach.

All four Plaintiffs were arrested and taken to the police station for processing. Daniel Jr., Daniel III, and Nathan were released on bond the following day; Jonathan was released as a juvenile, albeit subject to electronic monitoring and home detention.  Charges against Daniel III and Nathan proceeded to trial, and both men were acquitted.  The charges against Daniel Jr. and Jonathan were dropped.

The Plaintiffs commenced this action.  The Amended Complaint **(# 68)** alleges six claims: (i) a claim under 42 U.S.C. § 1983, sounding in the unconstitutional use of excessive force asserted against all Defendants[2]; (ii) a claim under 42 U.S.C. § 1983, sounding in "false arrest/unlawful seizure," asserted against all Defendants; (iii) a claim under 42 U.S.C. § 1983 against Denver, alleging an unconstitutional failure to train and/or supervise its employees, resulting in deprivations of constitutional rights due to the use of excessive force, failure to intervene, unlawful entry, false arrest, and unlawful prosecution; (iv) a claim under 42 U.S.C. § 1983, sounding in the unconstitutional entry into the Plaintiffs' residence in violation of the 4th and 14th Amendments asserted against all Defendants; (v) a claim under 42 U.S.C. § 1983, asserted against the individual Defendant Officers, sounding in malicious prosecution in violation of the 4th and 14th Amendments; and (vi) a claim under 42 U.S.C. § 1983, asserted against the individual Defendant Officers, sounding in vindictive prosecution in retaliation for the Plaintiffs exercising their First Amendment rights, in violation of the 4th and 14th Amendments.

---

[2]     Each claim asserted against "all Defendants" includes allegations that appear to assert *Monell*-type claims against Denver.

Both Denver (**# 74**) and the Defendant Officers (**# 75**) move for summary judgment on some or all of the claims asserted against them.  The Court will not independently recite the arguments raised in those motions here, and will identify those arguments in the course of its analysis.

## ANALYSIS

### A.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P.

56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.  The court then applies the law to the undisputed facts and  enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.  If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## B.  Defendant Officers' motion

The Court turns first to the motion by the Defendant Officers.  With regard to several of the claims, the Defendant Officers invoke the doctrine of qualified immunity.

Qualified immunity protects individual state actors from civil liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Messerschmidt*, 132 S.Ct. at 1244.  The qualified immunity analysis proceeds along two lines: (i) the Court examines whether the facts alleged in the plaintiff's pleading are sufficient to state a cognizable claim for violation of a constitutional right, and (ii) the Court also examines whether, at the time of the conduct at issue, that constitutional right was

"clearly established" under existing law in the particular circumstances presented. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The Court may undertake these two inquiries in whichever order it deems fit. *Id.* at 236.

For all practical purposes, the first inquiry is indistinguishable from the inquiry that the Court would take in assessing a garden-variety Rule 56 challenge to the sufficiency of the Plaintiffs' evidence. The Court is required to take the well-pled allegations in the light most favorable to the Plaintiffs and assess whether the facts alleged are sufficient to demonstrate the violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The "clearly established" inquiry examines whether the contours of the constitutional right were so well-settled, in the particular circumstances presented, that "every reasonable [state] official would have understood that what he is doing violates that right." *Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012). To satisfy this prong, the burden is on the Plaintiffs to point to Supreme Court or Tenth Circuit precedent (or the clear weight of other circuit courts) that recognizes an actionable constitutional violation in the circumstances presented. *Schwartz v. Booker*, 702 F.3d 573, 587-88 (10th Cir. 2012); *see also Thomas v. Durstanti*, 607 F.3d 655, 669 (10th Cir. 2010) (plaintiff bears the burden of citing to requisite authority). It is not necessary for the Plaintiffs to adduce a case with identical facts, but the Plaintiffs must identify some authority that considers the issue "not as a broad general proposition," but in a "particularized" sense[3] – for example, it is not sufficient to ask whether it is "clearly established" that the Fourth

---

[3]    *Brosseau* notes, in *dicta*, that in "obvious" cases, it may be that the contours of the constitutional right are so clear that citation to a relevant body of case law is unnecessary. *Id.*, *citing Hope v. Pelzer*, 536 U.S. 730, 738 (2002). However, in *Hope*, the Supreme Court specifically found pre-existing Circuit Court precedent sufficient to clearly establish that the

Amendment prohibits the use of excessive force in effecting an arrest; rather, the court examines whether that constitutional principle has previously been found to prohibit "shoot[ing] a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Brosseau v. Haugen* 543 U.S. 194, 198-200 (2004).

With these considerations in mind, the Court turns to the particular claims against the Defendant Officers.

### 1. Excessive force claim

The individual Defendant Officers concede that the excessive force claims asserted against them by the particular Plaintiff they engaged in physical contact with may proceed to trial; in other words, Officer Jackson concedes that Daniel III's excessive force claim against him could survive summary judgment, and Sergeant Motyka concedes that Nathan's excessive force claim against him should proceed, etc.

However, all of the Defendant Officers are apparently named in each Plaintiffs' excessive force claim, and in that respect, each Defendant Officer moves for summary judgment on the excessive force claims by the Plaintiffs with whom those officers had no physical contact.  In other words, Officer Jackson seeks summary judgment on Daniel Jr., Nathan, and Jonathan's claims of excessive force against him, and so on.

The Plaintiffs contend that each Defendant Officer is liable to the Plaintiffs that they did not touch under a "failure to intervene" theory.  Courts have recognized that a state actor does not have to actively participate in a constitutional deprivation to be held liable for it; an actor who is aware of a fellow state actor engaging in a constitutional deprivation is obligated to

---

conduct in question (handcuffing an inmate to a hitching post for several hours as a punishment) was unconstitutional. *Id.* at 742.

intervene in order to prevent or halt that violation.  *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008).  The Plaintiffs argue that each of the Defendant Officers are liable to each of them because each officer failed to prevent his fellow officers from applying excessive force to each Plaintiff.

To establish a constitutional violation under a "failure to intervene" theory, the Plaintiffs must show: (i) the defendant officer was present at the scene; (ii) the defendant officer witnessed another officer applying force; (iii) the application of force was such that any reasonable officer would recognize that the force being used was excessive under the circumstances; and (iv) the defendant officer had a reasonable opportunity to intercede to prevent the further application of excessive force, but failed to do so.  *See generally Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996); *Gruenwald v. Maddox*, 274 Fed.Appx. 667, 674 (10th Cir. 2008) (unpublished) (defendant officer must be present at the scene to observe the application of force); *Randall v. Prince George's County*, 302 F.3d 188, 204 & n. 24 (4th Cir. 2002) (defendant officer must "know[ ] that a fellow officer is violating an individual's constitutional rights"; if he "lacks such specific knowledge, he cannot be a participant in the unlawful acts").

The record, taken in the light most favorable to the Plaintiffs, does not suffice to demonstrate these elements.  Although it is undisputed that all four Defendant Officers were present inside the home when the alleged excessive force was being applied to each Plaintiff, the record reflects that the other officers only saw a physical struggle between Officer Valdez and several of the Plaintiffs; no officer testified to witnessing Officer Jackson, Sergeant Motyka, or Officer Martinez making physical contact with one of the Plaintiffs, nor do the Plaintiffs' depositions clearly indicate that they affirmatively observed one officer watching another officer

making physical contact with one of the Plaintiffs.  Thus, at best, the only opportunity for any

Defendant to intercede to prevent the use of excessive force would be to prevent Officer Valdez

from using such force.

The record further reflects that, under the circumstances described by the Defendant

Officers, it was not necessarily apparent that Officer Valdez's use of force against one or more of

the Plaintiffs was excessive.  Officer Jackson, Sergeant Motyka, and Officer Martinez all

testified that they saw one or more of the Plaintiffs "throwing punches" at Officer Valdez.

Under such circumstances, the other Defendant Officers could reasonably have believed that

Officer Valdez was entitled to use physical force to protect himself.  *Ortiz v. Santora*, 223

F.Supp.2d 387, 394 (D.Conn. 2002) (officer who punched plaintiff "only after [the plaintiff] had

punched him several times" entitled to summary judgment on excessive force claim).  Although

the Plaintiffs generally deny attempting to punch Officer Valdez (or any other officer), Daniel III

acknowledged that, in his attempt to pull Jonathan away from Officer Valdez, he "bumped"

Officer Valdez and he understood that Officer Valdez perceived that contact to be Daniel III

attempting to hit him (even though that was not Daniel III's intent).  Thus, there is some

corroboration from the Plaintiffs of physical contact between, at the least, Daniel III and Officer

Valdez, supporting the Defendant Officers' belief that they saw aggression towards Officer

Valdez that would render his use of force against the Plaintiffs to be privileged self-defense.

Accordingly, the Court finds that the Plaintiffs cannot establish that any of the Defendant

Officers failed to intervene to halt another officers' use of excessive force.

Moreover, the Court agrees with the Defendant Officer that the record also fails to

disclose facts that would permit the conclusion that any of the Defendant Officers had a

reasonable opportunity to intercede to prevent Officer Valdez from using physical force against one or more of the Plaintiffs.   Jonathan, the primary subject of Officer Valdez's use of force, testified that "everything happened so fast."  This is consistent with the testimony of the Defendant officers that the physical altercation between Defendant Valdez and one or more Plaintiffs developed rapidly.  The Plaintiffs contend that there is a dispute in the record, with Nathan testifying that the altercation developed over "multiple minutes" and Daniel III testifying that it was "several minutes more" before he and Jonathan were taken outside and assaulted.  The Plaintiffs' citation to Nathan's testimony clearly relates to the period of time between Daniel Jr. going to the door in response to the knocking, Daniel III following, and Jonathan also going to the door; the cited passage from the deposition ends before the door is opened and the officers enter.[4]   Given the speed at which the altercation occurred, the Court agrees that there was no clear indication of a reasonable opportunity for any of the other Defendant Officers to intervene to restrain Officer Valdez, even if they did observe him and conclude that he was engaging in excessive force.  *See e.g. O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) (no duty to intervene where "three blows were struck in such rapid succession that the defendant had no realistic opportunity to attempt to prevent them"), *cited with approval in Fogarty*, 523 F.3d at 1164.

---

[4]    Although Daniel III's testimony about the elapse of time between the moment he was taken outside and the time in which he saw Jonathan punched is largely irrelevant to the question of how quickly the altercation involving Officer Valdez occurred, the Court further notes that Daniel III's testimony on this point was ambiguous: he initially testified that he didn't "remember the exact time" duration, and that "everything happened so quick"; upon further prompting as to whether it was "about a minute" or "a couple of minutes," Daniel III stated that it was "maybe a minute."

The Plaintiffs argue that the Court should examine the circumstances more broadly, considering the actions of the Defendant Officers before Daniel Jr. even opened the door.  The argument is derived primarily from *Casey v. City of Federal Heights*, 509 F.3d 1278, 1283 (10th Cir. 2007).  There, the plaintiff left a courthouse carrying an official court file, an act that "may have been a misdemeanor under Colorado law."  *Id.* at 1279-80.  One defendant police officer, Officer Sweet, confronted the plaintiff as the plaintiff was returning to the courthouse from the parking lot.  The plaintiff stated that he was returning the file, and proffered it to Officer Sweet, but Officer Sweet refused to take it.  The plaintiff then attempted to walk around Officer Sweet and continue back to the courthouse, but Officer Sweet grabbed the plaintiff's arm and then jumped on the plaintiff's back.  At no time did Officer Sweet advise the plaintiff that he was under arrest or instruct him to stop resisting.  A second police officer, Lor, arrived on the scene and discharged her Taser at the plaintiff.  The plaintiff managed to remove the Taser barbs, but other police officers arrived, piling on to the plaintiff.  Officer Lor attempted to administer the Taser again, and a second police officer also attempted to apply a Taser to the plaintiff, and other officer "repeatedly banged [the plaintiff's] face into the concrete."  *Id.* at 1280.  Eventually, the plaintiff was subdued and arrested.

The 10th Circuit reversed the trial court's grant of summary judgment to Officers Sweet and Lor on the plaintiff's § 1983 excessive force claims.  It noted, among other things: (i) that the crime the plaintiff allegedly committed was neither violent nor severe (thus "reduc[ing] the level of force that was reasonable" to be used to apprehend the plaintiff); (ii) that Officer Sweet had no reason to believe that the plaintiff posed an immediate threat to the safety of anyone when the encounter began; and (iii) that the plaintiff was not actively resisting arrest or attempting to

evade arrest at the time Officer Sweet first applied force; and (iv) Officer Sweet never advised

the plaintiff that he was under arrest or requested that he submit peacefully.  *Id.* at 1281-82.

Under these circumstances, the 10th Circuit found that a reasonable jury could find that the

amount of force used by Officer Sweet was excessive.

The court then observed that the Plaintiff asserted not only a direct excessive force claim

against Officer Sweet, but also a claim based on "his failure to intervene and prevent the use of

excessive force by his fellow officers."  *Id.*  at 1283.  The court acknowledged the general rule –

that "a law enforcement official who fails to intervene to prevent another law enforcement

official's use of excessive force may be liable."  *Id.*  It then observed that:

> Here, [the plaintiff] alleges that Officer Sweet did nothing to
> prevent Officer Lor from Tasering him and other officers from
> beating him.  Moreover, because Officer Sweet initiated the
> confrontation as the first officer on the scene, his duty to keep the
> arrest from getting out of hand is particularly clear.  Also, Officer
> Sweet had trained Officer Lor in Taser use, and told her to put her
> Taser away after she used it a second time, which indicates that he
> had some authority over her.  Officer Sweet should have known
> that the force used by the other officers was excessive given that
> [the plaintiff] had not tried to fight or flee, and given the triviality
> of his offense.  Knowing that, he had some responsibility to keep
> his initial use of force from turning into a mêlée.

*Id.*

The Plaintiffs argue that, as in *Casey*, Officer Valdez was the officer knocking on the

door and initiating the entry into the home, and thus had a "duty to keep the arrest from getting

out of hand."[5]  But this both reads more into *Casey* than is present and attempts to extend its

---

[5]     Although the Plaintiffs offer this argument generically as to all of the Defendant Officers,
the facts and analysis of *Casey* are not particularly applicable to the officers other than Officer
Valdez.  *Casey*'s focus was limited to Officer Sweet's culpability for other officers' use of force,

application to a distinguishable factual scenario.  At best, *Casey* stands for the proposition that a police officer who initiates an arrest by using disproportionate force can be held liable for the additional applications of force made by fellow officers coming to assist him in that apprehension.  Assuming that Officer Valdez, the first through the door, is the equivalent of Officer Sweet in the scenario presented here, the rule of *Casey* is not applicable here because there is no contention that any of the other Defendant Officers assisted Officer Valdez by applying force to the person that Officer Valdez was attempting to subdue – Jonathan.  Rather, other officers on the scene fanned out and apprehended other individuals.  It is by no means clear that *Casey* would hold Officer Sweet culpable for other officers' use of excessive force against other suspects while Officer Sweet was engaged with Mr. Casey, simply because Officer Sweet initiated the instant contact; such an argument comes dangerously close to imposing a type of supervisory liability that extends *Casey* far beyond its reasoning.  Accordingly, the Court declines to hold that Officer Valdez is vicariously responsible for acts of excessive force committed by the other Defendant Officers against Plaintiffs other than Jonathan, simply because Officer Valdez initiated the entry into the home.

Accordingly, the Court grants the Defendant Officers' motions for summary judgment on the excessive force claims by the Plaintiffs that they did not personally interact with. Thus, Officer Valdez is entitled to summary judgment on Daniel Jr., Daniel III, and Nathan's excessive force claims; Sergeant Motyka is entitled to summary judgment on Daniel Jr., Daniel III, and Jonathan's excessive force claim; Officer Jackson is entitled to summary judgment on Daniel Jr.,

---

not the culpability of subsequently-arriving officers for each others' use of force or for Officer Sweet's use of force.

Nathan, and Jonathan's excessive force claim, and Officer Martinez is entitled to summary judgment on Daniel III, Nathan, and Jonathan's excessive force claim.

Separately, Officer Jackson moves for summary judgment on Daniel III's excessive force claim against him, arguing that because Daniel III admits "bumping" Officer Valdez while attempting to grab Jonathan, Officer Jackson was objectively reasonable in placing Daniel III in a "choke hold" and subsequently slamming him to the ground before handcuffing him.  The Court need not address this argument in detail.  Determination of whether the amount of force used in a given situation was "excessive" is a factually-intensive one that requires a full appreciation of all of the relevant circumstances.  *Casey*, 509 F.3d at 1281.  Given the allegations that the officers, including Officer Jackson, stormed into the house without consent or probable cause, the allegation that Officer Valdez was applying excessive force to Jonathan, and the ambiguity of the precise nature of the "bumping" that occurred between Daniel III and Officer Valdez, the Court cannot say that, as a matter of law, it was objectively reasonable for Officer Jackson to apply the amount of force he did to Daniel III.  That claim will proceed to trial.

### 2. False arrest

The Defendant Officers seek summary judgment on Daniel III's claim for false arrest, arguing that Daniel III cannot establish that they lacked probable cause to arrest him.  Probable cause to effect a warrantless arrest arises when "the facts and circumstances within the arresting officer's knowledge are sufficient to lead a prudent person to believe that the arrestee has committed or is committing a crime."  *Rojas v. Anderson*, ___ F.3d ___, 2013 WL 3389450 at n. 4 (10th Cir. Jul. 9, 2013), *citing Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995).  This determination is made by "examining the events leading up to the arrest and then deciding

whether these historical facts, viewed from the standpoint of an objectively reasonable officer, amount to probable cause." *Id.*, *citing Maryland v. Pringle*, 540 U.S. 366, 371 (2003).  The arresting officer's <u>subjective</u> interpretation of the arrestee's actions are irrelevant.  *Id.*

Here, taking all the evidence in the light most favorable to Daniel III, the Court finds a genuine dispute of triable fact as to whether any officer had probable cause to arrest Daniel III. The Defendants contend that, by attempting to pull Jonathan away from Officer Valdez and "bumping" Officer Valdez in the process, Daniel III could reasonably be construed to have violated Denver Municipal Ordinance § 38-31(a), which makes it unlawful for "any person . . . to interfere with or hinder any police officer" in the discharge of police duties, or C.R.S. § 18-3-203, which makes it unlawful for a person to "intentionally cause[ ] bodily injury to" a peace officer performing a lawful duty.  However, this argument fails to give due regard to Daniel III's (and, for that matter, Jonathan's) version of events.  Taken in the light most favorable to Daniel III, the record reflects that the Defendant Officers barged into the home uninvited, and that Officer Valdez, without provocation or explanation, attempted to unlawfully grab Jonathan. Daniel III's version of events suggests that he attempted to pull his younger brother away from a perceived unprovoked assault, and in doing so, made some incidental contact with Officer Valdez in the process.   The Court cannot say that, under these circumstances, an objectively reasonable police officer would conclude that Daniel III intended to cause bodily injury to Officer Valdez (nor, for that matter, conclude that Officer Valdez was engaging in a "lawful duty" by effecting a warrantless and unprovoked physical contact with Jonathan), nor that Daniel III was "interfer[ing]" with Officer Valdez performing a police duty, insofar as this version of

events discloses no lawful justification for Officer Valdez to make any physical contact with Jonathan.

The Defendants argue that Daniel III testified that he understood that "one of the officers perceived that [he] had hit the officer or was trying to hit the officer," and thus, it was reasonable for the officer to conclude that Daniel III had attempted to hit him.  Daniel III's testimony does confirm that an officer was "trying to say something about hit" or "tried to say I hit him," but even assuming that one of the officers (most likely, Officer Valdez) said that does not necessarily mean that such a statement or belief was objectively reasonable, on the part of either the officer speaking it or any officer hearing it and deciding to effect an arrest.  It may be that any "bumping" between Daniel III and Officer Valdez (or any other officer) was obviously mild and incidental, and complaints that the "bumping" was Daniel III trying to "hit" the officer were obvious exaggerations by the officer.  Or it may be that the officer's statement that Daniel III had "trying to hit" him was offered not as a recitation of fact but as a warning by the officer to Daniel III, in the sense of "don't go trying to hit me. . . ."  Because the record does not conclusively indicate facts that would show that it was objectively reasonable for the Defendants to believe that Daniel III "bumping" an officer was, in fact, Daniel III attempting to interfere with the officer's performance of duties or an attempt to cause bodily injury to the officer, the Court cannot say that the Defendants[6] are entitled to summary judgment on Daniel III's false arrest claim.

---

[6]     It is not clear from the Amended Complaint or the parties' motion briefing whether Daniel III asserts his false arrest claim only against the officer that arrested him – presumably, Officer Jackson – or whether Daniel III asserts this claim against all Defendant Officers, even those who had no apparent involvement in the decision to arrest him.  The Court strongly

3. Unlawful entry

Officers Martinez and Jackson and Sergeant Motyka move for summary judgment in their favor on the Plaintiffs' claims that they entered the home without consent or probable cause, in violation of the 4th Amendment.

A police officer's warrantless entry into a person's home by police is presumptively unreasonable and violative of the 4th Amendment, but that presumption may be rebutted by showing that an appropriate person gave voluntary consent for such entry. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). In the qualified immunity context, assessing the sufficiency of an officer's belief that a person has consented to the officer's entry into their residence turns on whether that belief was "objectively reasonable" in light of the law that existed at the time. *Pearson v. Callahan*, 555 U.S. 223, 244 (2009).

The moving Defendants argue that they were not privy to the discussions between Officer Valdez and Daniel Jr., and that they simply relied on Officer Valdez's belief that consent to enter the residence had been obtained. They contend that it was objectively reasonable for them to assume that their fellow officer's entry into the home indicated that Daniel Jr. had given his consent to entry. Once again, this argument must be analyzed under the facts taken in the light most favorable to the Plaintiffs. Under the version of events related by Daniel Jr., Officer Valdez knocked on the door, identifying himself as the police, and demanded that the door be opened. Officer Valdez proceeded to enter as soon as Daniel Jr. began to open the door, and the

---

encourages the parties to narrow the scope of the claims being asserted at trial to ensure that only the most factually and legally well-supported claims are asserted against each Defendant.

other officers followed.  Daniel Jr. testified that he was neither asked for nor gave his consent for the Defendant Officers to enter.

The Defendants argument seems to assume, as it must, that Officer Valdez may not obtain summary judgment on the Plaintiffs' unlawful entry claim against him, as Daniel Jr. denies having given the consent for the the officers to enter that Officer Valdez relies upon. Similarly, Officer Martinez testified that he understood Daniel Jr. to have consented to the officers entering the home based on hearing him say "sure, officers" in response to an unspecified question or command[7]; because the contention that Daniel Jr. made such a statement (or even what such a statement would reasonably have been understood to mean), the Court cannot conclude that Officer Martinez is entitled to summary judgment on the unlawful entry claim.

The situation is somewhat different with Officer Jackson and Sergeant Motyka.  They were some distance back from the door when Officer Valdez made his entry, and both testified that they did not hear Officer Valdez's exchange with Daniel Jr.  They simply assumed that, because Officer Valdez entered the home, Daniel Jr. must have given them permission to do so. They contend that this assumption, even if erroneous, was nevertheless objectively reasonable. In support of this contention, they rely primarily on *Huff v. City of Burbank*, 632 F.3d 539, 549 (9th Cir. 2011).  In *Huff*, four police officers went to a home to investigate whether that a child in the home had made threatening phone calls.  The homeowner came to the front porch and

---

[7]     Officer Martinez testified that he could not hear the entire conversation between Officer Valdez and Daniel Jr., but he could hear "bits and pieces" of it, including Daniel Jr. saying "sure, officers" at one point and "just a minute, officers" at another point.  He testified that he "had no doubt" from Daniel Jr.'s words and conduct that Daniel Jr. was consenting to the officers' entry. Thus, the record indicates that Officer Martinez's entry was premised upon his own observations of Daniel Jr., not based simply on the fact that Officer Valdez entered the home.

discussed matters briefly with the police.  The police asked if they could come into the house to discuss the matter further, and the homeowner asked if they had a warrant.  When they stated they did not, the homeowner refused to consent to the officers going inside.  The officers then asked if there were any weapons in the home.  The homeowner stated that she would go get her husband, and went inside.  Two officers followed her inside, despite not having obtained her consent to enter.  Two more officers, Munoz and Roberts, followed the first two officers, assuming that consent had been given to enter.  *Id.* at 542. The homeowner subsequently asserted unlawful search claims against all four officers, and the trial court granted a verdict in favor of the officers, finding that exigent circumstances permitted all four officers to enter.

On appeal, the 9[8] Circuit rejected the notion that exigent circumstances permitted all four officers to enter.[8]  *Id.* at 542-47.  However, it found that Officers Munoz and Roberts were nevertheless entitled to qualified immunity on the claim against them:

> The district court found that Roberts and Munoz entered the Huff residence because they believed they had been given consent. Though Roberts and Munoz were mistaken in their beliefs, their actions were reasonable under the circumstances.  They were not party to the conversations occurring between [the other officers and the homeowner].  They entered the Huff home only after their colleagues . . . No one communicated to them the basis for entry or indicated to them that they should remain outside.  Under those conditions, a reasonable officer may have believed, though mistakenly, that he and his fellow officials had been given consent to enter the home.  Roberts and Munoz are entitled to qualified immunity for their warrantless entry into the Huff residence in violation of the Fourth Amendment.

*Id.* at 549.

---

[8]      The two officers that made the initial entry sought certiorari, and the Supreme Court reversed the 9th Circuit, finding that exigent circumstances did exist to permit the immediate warrantless entry, regardless of the homeowner's refusal to give consent. *Ryburn v. Huff*, 132 S.Ct. 987, 992 (2012). The Supreme Court did not address the 9th Circuit's conclusion with regard to Roberts and Munoz, as no party sought review of that determination.

The Plaintiffs do not respond to this argument – essentially, that there was no clearly established precedent for the proposition that a police officer who was not privy to a person giving alleged consent to officers to enter their home may rely on his fellow officers' entry into the home to support a reasonable assumption that consent had been given – with clear authority establishing the contrary. *Courtney v. Oklahoma*, 722 F.3d 1216, 1222 (10th Cir. 2013) (it is plaintiff's burden to come forward with authority clearly establishing contours of the constitutional right in the circumstances presented). A case like *Huff* indicates that the question of whether late-arriving officers may assume that their fellow officers' presence inside a home indicates that consent to entry has been given is, at the very least, a debatable proposition, and the Plaintiffs have not come forward with precedent demonstrating that it is "beyond debate" that such an assumption is an unreasonable one for an officer to make. *Id.*

Generously construed, the Plaintiffs' brief can be understood to argue that Officer Jackson and Sergeant Motyka could not, in good faith, believe that their fellow officers' entry into the Plaintiffs' home was consensual. Both Officer Jackson and Sergeant Motyka testified that they were not immediately behind Officers Valdez and Martinez when the entry occurred, and that they arrived at the doorway some period of time later. Officer Jackson, in particular, testified that by the time he got to the doorway, he could observe a heated altercation taking place just inside. The existence of a heated dispute between officers and the occupants of the home might very well suggest that any assumption that the police had been invited in by the occupants was an unwarranted one.

On the surface, the Court agrees with the Plaintiffs that such an observation might be enough to dispel the good-faith belief by Officer Jackson or Sergeant Motyka that their fellow

officers had consent to enter the home.  But dispelling the assumption of consent at this point does not salvage the Plaintiffs' claims against Officer Jackson and Sergeant Motyka.  Their arrival at the doorway and recognition of an altercation between their colleagues and the home's occupants simply gave rise to an alternative basis to permit their entry: exigent circumstances. Courts recognize that ensuring the safety of fellow police officers can justify a warrantless entry into a home where officers have a reasonable basis to believe that immediate entry is necessary to protect themselves or others, so long as the manner of that entry is reasonable.  *U.S. v. Martin*, 613 F.3d 1295, 1303 (10th Cir. 2010).  Here, Officer Jackson and Sergeant Motyka, arriving at the doorway and seeing an altercation occurring, reasonably believed that they had to enter the home to protect Officers Martinez and Valdez.  Police may not rely upon their own unlawful conduct to create exigent circumstances. *Id.*  However, in this scenario, neither Officer Jackson nor Sergeant Motyka would have had knowledge that Officers Valdez and Martinez had unlawfully entered the home; as far as Officer Jackson and Sergeant Motyka were concerned, their entry into the home was simply to address an altercation (involving fellow officers), the genesis of which was apparently unknown to them.

Accordingly, the Court finds that Officer Jackson and Sergeant Motyka are entitled to summary judgment on the Plaintiffs' unlawful entry claim.  Officer Martinez's motion for summary judgment on this claim is denied.

### 4. Malicious prosecution

All Defendant Officers seek summary judgment on the Plaintiffs' claims of malicious prosecution in violation of the Fourth and Fourteenth Amendments.

Turning first to the Fourth Amendment claim, it is not necessary for the Court to address all of the elements of that claim, as the Defendant Officers focus only on the Plaintiffs' inability to establish a particular one: the necessary element of a Fourth Amendment "seizure."  As explained in *Becker v. Kroll*, 494 F.3d 904, 914-15 (10th Cir. 2007), a malicious prosecution claim brought under the auspices of the Fourth Amendment requires a showing that the criminal defendant's (and putative § 1983 plaintiff's) prosecution included a type of "seizure" prohibited by that Amendment.  That seizure might be shown by, for example, the plaintiff's arrest and incarceration during the course of that prosecution.  *Id.*, *citing DE Bella v. Borough of Beachwood*, 407 F.3d 599, 603 (3d Cir. 2005) ("the type of constitutional injury that the Fourth Amendment is intended to redress is the deprivation of liberty accompanying prosecution, not prosecution itself").  But *Becker* rejects the notion that "typical pre-release conditions" imposed on a criminal defendant who is granted pre-trial release – "requiring a person to post bond, compelling a person to appear in court" – are not sufficient to constitute a Fourth Amendment "seizure" that would support a malicious prosecution claim of constitutional dimension.  *Id.* at 915.  At a minimum, a criminal defendant released on bond pending trial will suffer a "seizure" for Fourth Amendment purposes if, in addition to typical pre-trial release restrictions, he his subjected to "another significant restraint on liberty, such as restrictions on travel."  *Id.* at 916.

At this point, the Court pauses to note that Jonathan's malicious prosecution claim includes facts demonstrating the type of Fourth Amendment "seizure" contemplated by *Becker*.  His conditions of pretrial release included being subjected to some form of home detention – Jonathan testified that he was permitted to leave his home only on specified days set on a calendar that he would consult – and his compliance with those terms was enforced by an ankle

monitor he was required to wear.  *Becker* acknowledges that restrictions on a criminal defendant's ability to leave the state might constitute a type of "seizure" that could support a malicious prosecution claim under the Fourth Amendment.  *Id.*, *citing Murphy v. Lynn*, 118 F.3d 938, 045 (2d Cir. 1997) (for the proposition that "plaintiff seized when ordered not to leave state and required to attend court").  Confinement to one's home is certainly an even more significant restraint on liberty that confinement to one's state.  Thus, Jonathan's malicious prosecution claim clearly withstands the Defendant Officer's challenge.

The sufficiency of the remaining Plaintiffs' claims are less clear.  It is undisputed that, after being arrested, each of the remaining Plaintiffs were briefly released on bond within two days of their arrest.  One might reasonably assume that arrest and incarceration, although brief, certainly would constitute a Fourth Amendment "seizure," and a case like *Becker* is somewhat ambiguous on this point.  The plaintiff in *Becker* was "was never arrested, incarcerated, or otherwise placed under the direct physical control of the state"; rather, it appears that she was brought before the court on a summons, subjected to a preliminary hearing, and that the charges against her were dismissed shortly thereafter.  494 F.3d at 915.  The 10th Circuit found these acts did not amount to a "seizure" of Fourth Amendment significance.  But in passing, the court seemed to indicate that "arrest or imprisonment" were the traditional indicia of a Fourth Amendment seizure, *id.* at 914-15, and it is undisputed that Daniel Jr., Daniel III, and Nathan each experienced an arrest and a brief incarceration prior to their release on bond.  Thus, *Becker* would seem to suggest that a malicious prosecution claim might lie under § 1983, at least for the period of time that these Plaintiffs were incarcerated.

But the Defendant Officers point out that a malicious prosecution claim commences with a <u>prosecution</u>, not simply an arrest.  In *Wilkins v. DeReyes*, 528 F.3d 790, 798 (10th Cir. 2008), the court explained that "unlike a false arrest or false imprisonment claim, malicious prosecution concerns detention only after the institution of legal process."  *Wilkins* marks the "institution of legal process" in a case involving a warrantless arrest at the time of the "constitutionally-required probable cause hearing," as that is the point at which "extended restraint on liberty following arrest" occurs.  *Id.*; *see also Mondragon v. Thompson*, 519 F.3d 1078, 1083 (10th Cir. 2008) ("after the institution of legal process, any remaining constitutional claim is analogous to a malicious prosecution claim").  An unjustified seizure that occurs prior to that point is redressible through the conceptually-similar but legally-distinct claim of false imprisonment (or perhaps even false arrest).  *Id.* at 799 n. 5 ("a person unlawfully arrested without legal process can bring a Fourth Amendment claim sounding in false imprisonment . . . the institution of legal process separates the two claims-and thus makes them legally distinct"); *Wallace,* 549 U.S. at 389-90 ("If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more. From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself").

In this regard, the Defendant Officers are correct that the first appearance that Daniel Jr., Daniel III, or Nathan made before a court occurred in mid-February 2009, long after they had secured their release on bond.[9]  Thereafter, the only restraints imposed on their liberty were the

---

[9]     Under Colorado law, only persons charged with certain felonies may obtain a preliminary hearing (the same as the "probable cause hearing" described in *Wilkins*) upon demand. C.R.S. § 16-5-301(1)(a).  Here, the Plaintiffs were charged only with misdemeanors and the Colorado

type of "typical pre-release conditions" imposed on all criminal defendants – the obligation to appear at court hearings and trial is the only post-arraignment "restraint" the Plaintiffs' response clearly identifies.  Thus, the Court agrees with the Defendant Officers that a malicious prosecution claim by Daniel Jr., Daniel III, and Nathan cannot lie under the Fourth Amendment.  It may very well be that the facts identified by these Plaintiffs would be sufficient to support a § 1983 claim sounding in false imprisonment – vindicating their post-arrest but pre-arraignment incarceration – or may be subsumed by the Plaintiffs' existing false arrest claims that are proceeding to trial, but to the extent that the Amended Complaint purports to allege only a claim sounding in "malicious prosecution" under the Fourth Amendment, that claim is deficient with regard to these Plaintiffs.  Accordingly, the Court finds that the Defendant Officers are entitled to summary judgment on Daniel Jr., Daniel III, and Nathan's malicious prosecution claims sounding in the Fourth Amendment.

The Plaintiffs also assert malicious prosecution claims sounding in the Fourteenth Amendment's Due Process clause.  The 10th Circuit recognizes such a claim, although it does not precisely define it.  In *Mondragon*, the court explained that "[t]he initial seizure is governed by the Fourth Amendment, but at some point after arrest, and certainly by the time of trial, constitutional analysis shifts to the Due Process Clause" of the Fourteenth Amendment.  519 F.3d at 1082.

---

courts have regularly found that in such circumstances, no preliminary hearing is required. *People v. Garcia*, 176P.3d 872, 872 (Colo.App. 2007).  In the absence of a preliminary hearing to use as the starting point to determine when the criminal proceedings against the Plaintiffs "initiated," the Court is inclined to simply default to the date of their arraignment before a judge.  *See Wallace v. Kato*, 549 U.S. 384, 389 (2007) ("a false imprisonment ends once the victim becomes held *pursuant to such process*-when, for example, he is bound over by a magistrate or arraigned on charges") (emphasis in original).

The Defendant Officers argue that no such claim is cognizable, citing only to *Becker*. There, the 10th Circuit, considering the Supreme Court's highly-fractured plurality decision in *Albright v. Oliver*, 510 U.S. 266, 268 (1994), concluded that "no §1983 claim will arise from filing criminal charges without probable cause under the substantive due process protections of the Fourteenth Amendment"; rather, it found that it is "the Fourth Amendment [that] protects a person's liberty interests under the constitution by ensuring that any arrest or physical incarceration attendant to a criminal prosecution is reasonable." 494 F.3d at 918-19.  It acknowledged the existence of cases in the *Mondragon* line that appear to recognize a procedural Due Process claim – those "recogniz[ing] that  at some point after arrest, and certainly by the time of trial, constitutional analysis [of a malicious prosecution claim] shifts to the Due Process Clause" – but found that the plaintiff there could not assert such a claim because "she was never arrested in violation of the Fourth Amendment," and thus, never suffered a significant restraint on her liberty as a result of any procedural irregularity.  *Id.* at 920-21.

*Becker* is distinguishable on this point; unlike the plaintiff there, the Plaintiffs here <u>were</u> arrested as a result of the procedural abuse they allege (that is, the Defendant Officers manufacturing evidence and filing false reports), and thus, did suffer a restraint on their liberty in a way that *Becker*'s plaintiff did not.  Moreover, *Becker*'s criminal charges were dismissed shortly after the preliminary hearing in that case; here, the charges against Nathan and Daniel III proceeded to a jury trial several months after they were initiated, and the charges against Daniel Jr. and Jonathan were dropped only after the acquittal of Nathan and Daniel III.  Thus, the Court finds *Becker* distinguishable.  Where, as here, a plaintiff suffered an arrest, incarceration, and lengthy criminal proceedings all due to what is alleged to be the improper invocation of the legal

process at the hands of the defendants, this Court is satisfied that a claim for malicious prosecution under § 1983, founded on the Fourteenth Amendment's Due Process clause, may lie. Accordingly, the Defendant Officers' motion for summary judgment on that claim is denied.

### 5. Vindictive prosecution

Finally, the Defendant Officers seek summary judgment on the Plaintiffs' claims of vindictive prosecution. Specifically, the Plaintiffs contend that the Defendant Officers initiated and influenced the criminal charges brought against them in retaliation for the Plaintiffs' invocation of their right to refuse consent to allow the Defendant Officers to enter the home and their criticism during and immediately after the incident of the Defendant Officer's conduct, among others.[10]

To establish a civil claim for vindictive prosecution, a plaintiff must show: (i) they exercised a protected right; (ii) the defendant possessed a "prosecutorial stake in the exercise of that right"; (iii) that the prosecution of the plaintiff was unreasonable; and (iv) the defendant intended to punish the defendant for the exercise of that right. *U.S. v. Suarez*, 263 F.3d 468, 479 (6th Cir. 2001). The Defendant Officers contend that the Plaintiffs' claims fail on several fronts,

---

[10] The Plaintiffs also contend that "their response [the the officers' unlawful entry] was an exercise of their legal rights under Colorado's 'Make My Day' law." C.R.S. § 18-1-704.5. That statute provides that a resident of a dwelling "is justified in using any degree of physical force" against a person who enters the dwelling unlawfully. Apparently, this argument is offered to suggest that, to the extent the Plaintiffs did indeed strike the Defendant Officers, they were legally justified in doing so. To some extent, this argument tends to undercut the Plaintiffs' position that they were the victims of unprovoked application of force by the Defendant Officers. It is somewhat incongruous for the Plaintiffs to argue on one hand that the officers rushed in any abruptly started beating them without provocation, and to argue on the other hand that the Plaintiffs were justified in initiating the use of force against the officers because the officers' entry into the home was unlawful.

but the Court will only address one: the sufficiency of a showing of any intent by the Defendants to punish the Plaintiffs because of the Plaintiffs' invocation of their rights.

Recognizing that "motives are complex and difficult to prove," the Supreme Court has indicated that, in appropriate circumstances, it is permissible for a vindictive prosecution plaintiff to simply prove facts justifying a presumption of a vindictive motive. *U.S. v. Goodwin*, 457 U.S. 368, 373 (1982). However, it does so "only in cases in which a reasonable likelihood of vindictiveness exists." *Id.* Like many vindictive prosecution cases, *Goodwin* involved claims that a prosecutor filed more severe charges against a criminal defendant after the defendant refused a proposed plea bargain and insisted on proceeding to trial. The Court noted that "a defendant before trial is expected to invoke procedural rights that inevitably impose some 'burden' on the prosecutor," yet "it is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter." *Id.* at 381.

A parallel can be seen in the Plaintiffs' alleged invocation of their right to refuse consent to the Defendant Officers to enter their home. The refusal of a person to consent to a police intrusion into their home is hardly such an unusual situation that one could infer that police would act vindictively in retaliation on the few occasions when it did occur. Like a refusal to accept a plea bargain, a refusal of consent to enter arguably imposes additional "burdens" on police, but it is "unrealistic" to assume that a police officer's typical response to such a refusal is to manufacture unwarranted criminal charges against the person refusing. Thus, this Court is unwilling to simply presume that the Defendant Officers' decision to bring criminal charges against the Plaintiffs (even assuming the Plaintiffs' allegations are true), simply because the Plaintiffs withheld consent for the police to enter or criticized the police for having entered.

Without a presumption of vindictiveness, the Plaintiffs are obligated to point to evidence that reflects <u>actual</u> vindictive motives on the parts of the Defendant Officers.  They have not done so.  They do not point to, for example, a statement by a Defendant Officer indicating that the officer's decision to file criminal charges was because of a Plaintiff invoking any particular right.  The Plaintiffs argue that there is an "unwritten policy" among the officers that encourages them to file criminal charges in situations where the officers have used force (in order to "justify" the use of force), but this argument actually undercuts the Plaintiffs' position.  If the decision to file charges was based on the "unwritten policy" in order to justify the officers' use of force, that decision to file charges was <u>not</u> motivated by an intent to punish the Plaintiffs for invoking their rights.  The Plaintiffs place some reliance on a statement, presented via hearsay, from an unidentified non-party police officer who, when asked why the Plaintiffs were being arrested, allegedly stated that "we'll think of something on the way." Putting aside the evidentiary problems with this submission, a statement by an unknown police officer is irrelevant in establishing the <u>Defendant Officer's</u> motivations, absent proof that the unknown officer was purporting to repeat what he was told by the Defendants or was authorized by them to speak on their behalf.  At best, it simply stands for the proposition that the unknown officer himself did not know what the Defendant Officers intended to charge the Plaintiffs with.

Accordingly, the Court cannot say that the Plaintiffs have come forward with evidence that would support an inference that the Defendant Officer decided to initiate criminal charges against the Plaintiffs because the Plaintiffs invoked various rights.  Thus, the Defendants are entitled to summary judgment on all of the vindictive prosecution claims.

### C.  Denver's motion

Denver moves for summary judgment on the *Monell* claims against it, as well as the standalone "failure to train/failure to supervise" claim, arguing that the Plaintiffs cannot show that Denver maintains a custom or policy with deliberate indifference towards the potential that such policy could lead to constitutional violations.

Denver is not vicariously liable for any unconstitutional actions that the Defendant Officers may have committed; Denver's liability under § 1983 (if any) must arise based on Denver's own unconstitutional conduct, that is, if an official municipal custom or policy was the direct cause or a moving force behind the Defendant Officer's unconstitutional acts.  *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998), *citing Monell v. Dept. of Social Services*, 436 U.S. 658, 694 (1978).  Where, as here, the contention is that the municipal policies or actions reflect a failure to adequately train or supervise employees (as opposed to being a policy that facially directs or encourages unconstitutional conduct), the Plaintiffs must show that Denver was "deliberately indifferent" to the potential constitutional harm – that is, it had actual or constructive notice that its act or failure to act was "substantially certain" to result in constitutional violations, yet it consciously or deliberately chose to disregard that risk.  *Id.*  Such notice will typically take the form of "a pattern of tortious [unconstitutional] conduct" by its employees, although in some circumstances, single instances of conduct demonstrating a "highly predictable" or "plainly obvious" potential for unconstitutional violations is sufficient.  *Id.*

With these standards in mind, the Court turns to the Plaintiffs' allegations against Denver.

    1. <u>Excessive force</u>

The Plaintiffs do not contend that Denver's policies regarding the appropriate use of force by its police are facially unconstitutional; rather, they allege that Denver has failed to adequately train and supervise its employees in the operation of those policies and has failed to discipline employees when those policies are violated.

The bulk of the Plaintiffs' argument on this point derives from highly generalized statistics: the Plaintiffs point out that Denver had 235 complaints of unnecessary force lodged in 2007, of which only 5 were internally-initiated, and only one of which was sustained after investigation; that in 2008, 222 complaints of excessive force were lodged, etc.[11]  When it comes to identifying specific defects in Denver's policies or its training and supervision of its employees, the Plaintiffs are only slightly more specific.  At best, they contend: (i) the policies do not require officers to report <u>all</u> uses of force by fellow officers, but merely those that the officer considers "inappropriate, unnecessary, unreasonable, or excessive," thus resulting in an underreporting of excessive force incidents by police officers;  (ii) that Denver has "a lack of integrity in the investigation of use of force cases" that may lead officers to believe they can get away with unconstitutional conduct; (iii) that a former Independent Monitor of the police department characterized Denver's Internal Affairs Bureau as "particularly weak" in

---

[11]    The Plaintiffs acknowledge that "they do not hang their claim on sheer volume of complaints of excessive force, but offer that volume as one part of an informal, yet widespread and well-settled, practice of tolerating and ratifying the excessive use of force against citizens."

investigating "force and entry into residence cases"; and (iv) that there is an "unwritten rule that an excessive force report should be accompanied by some allegation of criminal wrongdoing."

However, the Plaintiffs offer little to correlate these general systemic failures to the particular constitutional violations that allegedly occurred here.  With the exception of the monitor's observation regarding defects in the investigation of entry into residence cases, the Plaintiffs' arguments are unconnected to the alleged use of force here, except in the broadest sense that it, too, is an alleged use of excessive force.  The Plaintiffs must show that the alleged unconstitutional custom or policy is "closely related to the ultimate injury"; requiring anything less would result in *de facto* vicarious liability of the type that *Monell* rejected.  *City of Canton v. Harris*, 489 U.S. 378, 391-92 (1989).  A broad contention that Denver's policies encourage the use of excessive force generally is precisely the sort of generalized proof of causation that *Harris* deems insufficient.  Indeed, the Plaintiffs' evidence is nothing more than "Denver's policies generally fail to discourage the use of excessive force," which, if held to be sufficient proof of causation, would essentially expose Denver to *Monell* liability in every case alleging excessive force, regardless of the particular circumstances – the type of vicarious liability that *Harris* and *Monell* eschew.

To carry their burden, the Plaintiffs must come forward with evidence that connects Denver's inadequate policies or training to the particular officers presented here. *See e.g. Young v. City of Providence*, 404 F.3d 4, 26 (1st Cir. 2005) (" The actions taken by Solitro that constituted excessive force must somehow have been caused—at least in part—by the City's failure to train, or erroneous hiring of, Solitro").  For example, if the Plaintiffs could show that one of the Defendant Officers here was involved in a prior use of force that could be considered

"excessive," but was not reported to Denver (and thus, the officer was not investigated, trained, or disciplined) because the officer observing that use of force did not consider it to fall within the mandatory reporting requirement under Denver's policies, that might be sufficient proof that Denver's policies were a motivating factor in the constitutional deprivation here.  Similarly if any of the Defendant Officers here were previously the subject of an inadequate investigation that could be said to have led to the instant use of excessive force with the Plaintiffs, that evidence might carry the Plaintiffs' burden.  But the Plaintiffs' response makes no effort whatsoever to tie the alleged deficiencies in Denver's policies to the particular violations alleged here, other than the draw them all under the general umbrella of "excessive force."  This is simply insufficient.

That leaves the Independent Monitor's deposition testimony (in an unrelated case).  The record indicates that he was asked, based on his observations and experiences, why "did the Denver Police Department need robust civilian oversight," and he responded that Denver's Internal Affairs Bureau "were too willing to accept any statement from an officer and not willing to follow up . . . [a]nd they were particularly weak on force cases and on cases involving, you know, entry into residences and cases involving deception."  The record does not reflect what time frame the Independent Monitor is addressing in this testimony, nor whether he is speaking about past problems or current problems (with "current" meaning 2009, or perhaps 2012 when the deposition was occurring) in the police department, etc.  Without any further context or clarification of this testimony, the Court cannot say that it, whether alone or in conjunction with the other evidence adduced by the Plaintiffs, sufficient to demonstrate that a Denver policy was the moving factor behind the alleged use of excessive force against the Plaintiffs here.  Denver is

thus entitled to summary judgment on the Plaintiffs' *Monell* claim sounding in the use of excessive force.

### 2. False arrest

The entirety of the Plaintiffs' proof on the issue of a Denver custom or policy motivating the unconstitutional arrest of the Plaintiffs without probable cause is the Plaintiffs' reference to testimony by a former Denver Police Manager of Safety about an "unwritten rule that a [use of] force report should be accompanied by some allegation of criminal wrongdoing," such as resisting arrest or interference with a police officer.

The Plaintiffs interpret this testimony to mean that police were encouraged to <u>fabricate</u> criminal conduct after the fact in order to justify their prior use of force, but this is not necessarily what the Manager of Safety stated. When asked why he would be concerned about the existence of such a custom, he responded "That was not – just because there's one or the other didn't.  You know, you need to look and say was there actually a basis for the charging of whichever offense was charged...  what you have to do is you have to go and look at the actual facts of the case and you would have to determine in your own mind was the actual case filed against the individual simply a way of covering for the use of force . . . or was it filed because the person actually violated some ordinance or statute."  The questioner then asked whether he observed "officers [who] would file baseless charges against an individual in order to hide their own misconduct," to which he responded "Tough to say."  If it was "tough to say" whether he observed any "baseless" charges filed simply to justify an officer's use of excessive force, the interpretation given to that testimony by the Plaintiffs – that the filing of such baseless charges to conceal the use of excessive force was common -- is unreasonable.  At best, the testimony

36

reflects a legitimate expectation that officers using force against a person would be able to justify that use of force by pointing to some criminal act that the person engaged it; it does not support the conclusion that officers were expected or encouraged to fabricate criminal charges to conceal unwarranted applications of force.

Thus, the Court finds that the Plaintiffs have not identified a custom or policy of Denver that reflects any deliberate indifference by Denver to the substantial certainty that the policy would lead to constitutional violations.

### 3. Unlawful entry

The Plaintiffs admit that Denver has a policy governing the use of "consensual search procedures," known as "knock and talk," but alleges that the policy was defective in two respects: (i) it "does not contain binding procedures as to the nature of the investigation prior to choosing to initiate a knock and talk"; rather, it merely suggests that officers consider various factors (such as the call history of the location, the criminal history of possible occupants, etc.) before deciding whether to perform a knock and talk; and (ii) the unit to which the Defendant Officers were assigned were not properly trained as to when to use a knock and talk and when to instead apply for a search warrant, and overwhelmingly relied on knock and talks as their preferred investigative tools.

The Court finds that the Plaintiffs have failed to show that Denver's policies or training regarding knock and talks reflected any deliberate indifference to a substantial certainty that such policy would result in constitutional violations.  Most notably, the Plaintiffs offer nothing more than vague and conclusory assertions that "the risk of Fourth Amendment violations [from the use of knock and talks] abounds," but point to nothing in the knock and talk policy that is

particularly constitutionally-perilous.  They do not, for example, assert that Denver's training on how to conduct knock and talks fails to adequately advise officers how to ascertain whether lawful consent to enter has been given.  They do not point to any evidence that supports the assertion that knock and talks are a tool whose use has been deprecated in the situation presented here, such that Denver's failure to train its officers to avoid such an outmoded or inappropriate tool could be expected to result in constitutional deprivations.  The Plaintiffs simply complain that Denver police should use fewer knock and talks and more of some other investigatory tool and should be required to do more investigation before resorting to a knock and talk.   Without a showing that knock and talks, as a general matter, pose an undue risk of constitutional violations, the mere fact that Denver encourages (or, at a minimum, does not discourage) their use is insufficient to establish that Denver maintains an unconstitutional policy in this regard.

The Plaintiffs cite extensively to past reports of the Independent Monitor that criticize Denver's high incidence of unlawful warrantless entries into residences, but those citations do not indicate that the Independent Monitor was particularly criticizing any aspect of Denver's knock and talk policy (much less the two particular aspects attacked here by the Plaintiffs). Indeed, some of the reports cited by the Plaintiffs mention "cases wherein officers made entry into private residences without consent, <u>a warrant, or exigent circumstances</u>" (emphasis added), suggesting that the Monitor's concern was something far more broad than the question of whether the knock and talk policy was somehow deficient.  Thus, the Court cannot conclude that the Independent Monitor's report justifies a conclusion that the knock and talk policy was so substantially certain to result in constitutional violations that Denver's use of it warrants *Monell* liability.

Accordingly, the Court finds that Denver is entitled to summary judgment on all of the Plaintiffs' *Monell* claims.

<u>**CONCLUSION**</u>

For the foregoing reasons, Denver's Motion for Summary Judgment **(# 74)** is **GRANTED**, and Denver is entitled to summary judgment on all claims asserted against it by the Plaintiffs.  The Defendant Officers' Motion for Summary Judgment **(# 75)** is **GRANTED IN PART**, insofar as each Defendant Officer is entitled to summary judgment on the excessive force claims by the Plaintiffs with whom those officers had no physical contact; Sergeant Motyka and Officer Jackson are entitled to summary judgment on the Plaintiffs' unlawful entry claims; all of the Defendant Officers are entitled to summary judgment on the malicious prosecution claim premised on the Fourth Amendment by Plaintiffs Daniel Jr., Daniel III, and Nathan; and all Defendant Officers are entitled to summary judgment on all Plaintiffs' vindictive prosecution claims; and **DENIED IN PART**, in all other respects.  The parties shall begin preparation of a proposed Pretrial Order pursuant to Docket # 21, and shall jointly contact chambers to schedule a pretrial conference.

Dated this 25th day of September, 2013.

BY THE COURT:

Marcia S. Krieger
Chief United States District Judge

39