**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger**

**Civil Action No. 11-cv-00102-MSK-KLM**

**DANIEL MARTINEZ, JR.;
NATHAN MARTINEZ;
DANIEL MARTINEZ III; and
JONATHAN MARTINEZ,**

> **Plaintiff,**

**v.**

**JASON VALDEZ,
ROBERT MARTINEZ,
ROBERT MOTYKA, and
BRYCE JACKSON,**

> **Defendants.**

---

**OPINION AND ORDER  GRANTING IN PART AND DENYING IN PART MOTION
FOR NEW TRIAL AND GRANTING IN PART MOTION FOR ATTORNEY FEES**

---

**THIS MATTER** comes before the Court pursuant to the Plaintiffs' Motion for

Prejudgment Interest (**# 140**), and the Defendants' response (**# 147**); the Defendants' Motion for

New Trial or Remittitur (**# 145**, as amended **# 146**), the Plaintiffs' response (**# 148**), and the

Defendants' reply (**# 153**); and the Plaintiffs' Motion for Attorney Fees and Costs (**# 156**), the

Defendants' response (**# 172**), and the Plaintiffs' reply (**# 175**, as supplemented **# 176**).

## <u>FACTS</u>

The Court assumes the reader's familiarity with the proceedings to date.  Thus, it offers

only a limited factual summary here and elaborates as necessary in the analysis.

This action arises from an incident that occurred on January 9, 2009.  On that date, the

Defendants, Denver Police Officers, went to the Plaintiffs' residence, ostensibly to conduct a

"knock and talk," inquiring about possible criminal activity occurring in the neighborhood. The parties sharply disputed the ensuing events, but it is sufficient to note that the Defendants entered the residence and a physical altercation ensued between the Plaintiffs and Defendants inside the house. The Defendants eventually subdued the Plaintiffs and placed them under arrest. The Defendants were charged with various forms of criminal assault, supported primarily by the testimony of the Defendants. Plaintiffs Nathan Martinez ("Nathan") and Daniel Martinez III ("Daniel III") proceeded to trial on those criminal charges and were acquitted by a jury; the charges against the remaining Defendants were thereafter dropped.

The Plaintiffs commenced this civil action against the Defendants, raising various claims under 42 U.S.C. § 1983 arising from the Defendants' entry into the residence, the altercation, the arrests, and the ensuing criminal prosecution. The case proceeded to a jury trial in September 2014. The jury entered the following verdict:

**Claim 1 - Unlawful entry**: Verdict for the Plaintiffs as against Defendants Martinez and Valdez; verdict in favor of Defendant Motyka.

**Claim 2 – Use of Excessive Force**: Verdict for all four Defendants, based on a finding by the jury that the amount of force used by the Defendants was not excessive.

**Claim 3 – False Arrest:** Verdict for the Plaintiffs as against the individual officer effecting each of their arrests.[1]

**Claim 4 – Malicious Prosecution**: Verdicts in favor of the Defendants as against all Plaintiffs.[2]

---

[1]     Daniel Martinez Jr. was arrested by Defendant Robert Martinez. Nathan Martinez was arrested by Defendant Motyka. Daniel III was arrested by Defendant Jackson. Jonathan Martinez was arrested by Defendant Valdez.

**Claim 4a – Continued Malicious Prosecution**: Verdict in favor of Plaintiff Jonathan Martinez against Defendant Valdez.

Based on these verdicts, the jury awarded the following damages against the following Defendants:

| Plaintiff | Type of Damages | Defendant Martinez | Defendant Motyka | Defendant Jackson | Defendant Valdez |
|---|---|---|---|---|---|
| **Daniel Jr.** | Actual | $ 60,000 | $0 | $0 | $ 40,000 |
| | Punitive | $ 100,000 | $ 62,500 | $ 0 | $ 100,000 |
| | Total | $ 160,000 | $ 62,500 | $ 0 | $ 140,000 |
| **Nathan** | Actual | $ 25,000 | $75,000 | $ 0 | $ 25,000 |
| | Punitive | $ 100,000 | $ 62,500 | $ 0 | $ 100,000 |
| | Total | $ 125,000 | $ 137,500 | $ 0 | $ 125,000 |
| **Daniel III** | Actual | $25,000 | $0 | $ 40,000 | $ 25,000 |
| | Punitive | $ 100,000 | $ 62,500 | $ 0 | $ 100,000 |
| | Total | $ 125,000 | $ 62,500 | $ 40,000 | $ 125,000 |
| **Johnathan** | Actual | $ 25,000 | $ 0 | $ 0 | $ 200,000 |
| | Punitive | $ 100,000 | $ 62,500 | $ 0 | $ 300,000 |
| | Total | $ 125,000 | $ 62,500 | $ 0 | $ 500,000 |

The parties then filed the instant post-verdict motions.  The Plaintiffs moved for an award of prejudgment interest (**# 140**), suggesting that the Court apply the statutory 9% interest rate of

---

[2]     The Verdict Form reflects that the jury found that Defendant Jackson did not make any statements that led to the prosecution of Plaintiffs Daniel Martinez Jr. ("Daniel Jr.") or Nathan Martinez; that Defendants Motyka and Jackson's statements concerning Plaintiffs Daniel III and Jonathan Martinez were supported by probable cause (and that Defendants Martinez and Valdez's statements were not); and that Defendants Martinez and Valdez's statements as to all Plaintiffs were not made with malice.

C.R.S. § 13-21-101, resulting in a total award of approximately $ 340,000 in prejudgment interest.  The Defendants moved for a new trial and for remittitur (**# 145**, as amended **# 146**), arguing that: (i) a new trial should be granted because the jury's verdict is inconsistent and irreconcilable, (ii) the total of $ 1.25 million in punitive damages is excessive and arbitrary, (iii) new trial or remittitur is warranted with regard to the actual damage awards by the jury because such awards are excessive and inconsistent with the evidence at trial.  The Plaintiffs also moved for an award of attorney fees and costs (**# 156**), seeking a total of approximately $ 478,000 in attorney fees (plus an unspecified multiplier due to the difficulty of the case) and approximately $ 18,000 in costs.[3]

## ANALYSIS

### A.  Motion for New Trial

Because the Plaintiffs' motions presuppose the verdict standing (in whole or part), it is appropriate to first consider the Defendants' motion seeking either a new trial or remittitur.

#### 1.  Internal inconsistency in the verdict

The Defendants first argue that the verdict should be set aside and a new trial granted because the jury's verdict is inherently inconsistent and irreconcilable in three different respects: (i) the finding that all of the Defendants lacked probable cause to arrest (Claim 3) is inconsistent with the finding that Defendants Motyka and Jackson had probable cause for the statements they made later during the prosecution of Daniel Jr. and Nathan Martinez, such that they were not liable for malicious prosecution (Claim 4); (ii) the finding that Defendant Motyka's entry into the residence was justified by exigent circumstances (Claim 1) is inconsistent with the finding that

---

[3]    On March 3, 2015, the Clerk of the Court taxed costs (**# 162**) in the amount of $14,679.86.  The Plaintiffs have not supplemented their motion identifying those costs that were not taxed by the Clerk and arguing which such costs should nevertheless be awarded.

no probable cause existed to arrest the Plaintiffs (Claim 4), as Defendant Motyka testified that he entered the residence to protect Defendant Valdez from being assaulted; and (iii) the finding that Defendant Valdez engaged in malicious prosecution by continuing the prosecution of Plaintiff Jonathan Martinez (Claim 4a) is inconsistent with the finding that Defendant Valdez did not engage in the malicious prosecution of Jonathan initially (Claim 4).  The Defendants argue that the jury's failure to follow an instruction on the verdict form is further evidence of jury "confusion."

Courts may set aside jury verdicts that are fundamentally inconsistent, but they must do so with great reluctance and considerable deference to the jury's factfinding.  *Johnson v. Ablt Trucking Co.,* 412 F.3d 1138, 1143-44 (10th Cir. 2005).  A new trial is warranted only where "the essential controlling findings are in conflict" and there is no "plausible theory that supports the verdict."  *Id.*  The mere fact that it may be difficult to reconcile apparently conflicting verdicts is not, of itself, grounds for granting a new trial.  *Id.*  Relief is appropriate only when it is impossible to reconcile the verdicts.  *Id.*

### a. Failure to submit a trial transcript

Before turning to the merits of the Defendants' argument, the Court must first address two preliminary issues.  First, the Court notes that an attack on a jury verdict because it is inherently inconsistent is a factually-intensive matter, requiring careful examination of the trial record to ascertain precisely what evidence was presented in support of each claim and what factual theories counsel presented in closing arguments.  Especially in cases such as this, where the operative facts were highly disputed and the key evidence was testimonial rather than documentary, it is nearly impossible to present such a challenge without supplying a trial transcript.  It is not sufficient for counsel to present such a motion relying entirely on counsel's

recollections and characterizations of the testimony, rather than by means of specific citations to and quotations from the trial record; such recollections and characterizations are often mistaken about the precise content of the testimony, skewed, conflated with statements made by witnesses outside of trial, or otherwise unreliable in a host of ways.[4]   Moreover, the failure to supply a transcript prevents a party from specifically citing the Court to the particular location in the record where the evidence may be found; general references to "witnesses testified that . . ." or even "witness X testified that . . . " require the Court to canvass the record and speculate about which particular statements by a witness the party is relying upon.  This improperly requires the Court to adopt the role of advocate.

Accordingly, a party seeking to set aside a verdict on the grounds of inconsistency will almost always be required to supply the Court with a transcript of the pertinent portions of the record (as will a party opposing such a motion).  Because the Defendants here did not file a transcript of the trial and have relied solely upon their own recollections and characterizations of the trial testimony, the Court denies the Defendants' motion for that reason alone.  (Nevertheless, for purposes of completeness, the Court will proceed to discuss the Defendants' motion in light of the record as reflected in the unofficial rough transcript prepared by the Court Reporter during trial.)

b. Failure to timely object to verdict

The second threshold issue concerns the Plaintiffs' contention that the Defendants have waived any ability to seek a new trial based on an inconsistent verdict because they failed to object to the verdict on that ground prior to the Court discharging the jury.  In *Johnson*, the 10th

---

[4]      This is precisely the case here: both sides present counsel's own recollections and characterizations of the facts, but as discussed below, careful review of the record often does not support such contentions.

Circuit explained that "a party waives the right to object to inconsistencies in a general verdict with special interrogatories if it does not object on that ground before the jury is discharged," requiring the court to conduct only a plain error review of the verdict. *Id.* at 1141. It went on to note that "[w]hen the jury returns a special verdict, however, a party is not required to object to inconsistencies in the verdict before the jury is discharged in order to preserve the issue." *Id.* Thus, the parties' first point of dispute is whether the Court requested the jury to return a "general verdict with special interrogatories" or a "special verdict."

A "general verdict" is one that "requires the jury to announce the ultimate legal result of each claim"; a "special verdict" is one which "presents the jury with specific questions of fact such that after the jury returns its verdict, the court applies the law to the facts found by the jury and enters judgment accordingly." *Id.* at 1142. The verdict form used by this Court is unambiguously a special verdict form, requiring the jury to make specific factual determinations; the Court then enters judgment on the various claims consistent with the jury's factual findings. At no time is the jury asked to make findings of legal liability or to announce the legal rights of a party. Indeed, the verdict on Claim 4 demonstrates the point. The jury made factual findings that, for example, Defendants Jackson and Motyka's statements during the Plaintiffs' prosecution were not without probable cause. The legal effect of such a finding is that it defeats a malicious prosecution claim because a lack of probable cause is an essential element of such a claim. But the jury was not asked to go on and affirmatively state that it was finding a verdict for those Defendants as a result of its factual findings. Put differently, applying the law to the jury's findings is a role that this Court assumes when entering judgment. The Plaintiffs' response to the motion contends that "it is clear . . . that the Court submitted a general verdict

form with special interrogatories," but beyond stating that proposition, the Plaintiffs do not elaborate on this argument, perhaps because it is fundamentally untenable.

Thus, because it is apparent that the verdict form used here was a special verdict, not a general verdict with interrogatories, the Defendants' failure to object to the alleged inconsistency prior to the jury's discharge does not preclude the instant request for a new trial.

<u>c. Merits</u>

The Court then turns to the particular inconsistencies asserted by the Defendants.

(i). <u>False arrest vs. Malicious Prosecution</u>

To avoid double negatives (and admittedly misrepresenting the burden of proof in the process) the Court restates the jury's findings with regard to Claim 3 and Claim 4.  On Claim 3, knew the jury found that each Plaintiff proved that he was arrested for assaulting a police officer without probable cause (that is, without the officer having an objectively-reasonable basis to believe that the Plaintiff had committed a crime); this resulted in a verdict against each individual Defendant.  However, the jury also found on Claim 4 that the Plaintiffs did not prove that Defendants Motyka and Jackson made statements the criminal proceedings against the Plaintiffs without probable cause (that is, without the officer having a subjectively-reasonable basis to believe that the testimony was truthful and accurate); this resulted in a judgment for Defendants Motyka and Jackson.  Thus, the Defendants argue that there is an inherent inconsistency between the jury finding that Defendant Motyka and Jackson <u>had</u> probable cause to make statements supporting the criminal prosecution of the Plaintiffs for assault on a police officer, but did <u>not</u> have probable cause to arrest the Plaintiffs for assault on a police officer in the first place.

Based on the limited evidentiary record regarding these Defendants' involvement in the prosecution of the Plaintiffs, the Court disagrees. The Court will assume, for purposes of this motion, that the jury's verdict on the False Arrest claim was properly supported by the record – *i.e.* that the Defendants lacked probable cause to arrest the Plaintiffs for assault. (The Defendants do not argue that such a verdict is contrary to the evidence.) Then the Court turns to the factual record regarding the precise statements Defendants Motyka and Jackson made during the Plantiffs' criminal prosecution. That record is fairly skeletal. Only two admitted exhibits relate to any of the Plaintiffs' criminal prosecutions, Exhibits 163 and 164. Exhibit 163 consists of a two-page Criminal Summons and Complaint, charging Daniel III with 3d Degree Assault on a Police Officer. (The remainder of the exhibit consists of the docket sheet for that criminal prosecution.) The Summons page is apparently signed by Police Officer James Medina, a non-party to this case.[5] The second page of the document contains a narrative statement, apparently given by Defendant Valdez as the Complainant and recorded and signed by Defendant Martinez as the receiving officer. Exhibit 164 is a similar document, asserting the same charge against Nathan Martinez. Once again, it appears that Officer Medina signed the Summons page. The second page of this exhibit is similar to Exhibit 163 – a narrative statement given by Defendant Valdez and recorded by Defendant Martinez, signed by Defendant Martinez. Thus, the record does not reflect the contents of any <u>written</u> statements[6] by Defendants Motyka and Jackson,

---

[5]     The Court reaches this conclusion based on the badge no., 99072, which accompanies the otherwise illegible signature on the Summons. The final pages of Exhibit 163 include a list of the police officers pertinent to the criminal case and their corresponding badge numbers. Badge no. 99072 belongs to Officer Medina. This is also consistent with another endorsement on the Summons page that appears to read "JM99072," Officer Medina's initials and badge number.

[6]     Defendant Motyka testified that he "generated one report" as a result of this incident. That report (Exhibit 64) was tendered to Defendant Motyka during his testimony but it was never

much less demonstate that such statements precipitated the initiation of criminal charges against the Plaintiffs.

The Court then turns to the oral testimony regarding the criminal prosecution and the role played by Defendants Motyka and Jackson in it.   Considering Defendant Motyka first, he testified here that he gave testimony in "their criminal trial" – apparently the joint trial of Daniel III and Nathan – on or about January 4, 2010.  Defendant Motyka was not asked about, and did not generally describe, the testimony he gave at the trial.  However, there is some indirect testimony that revealed certain details about the contents of Defendant Motyka's 2010 testimony.  On one occasion, the Plaintiffs' counsel here sought to impeach Defendant Motyka's testimony with the transcript of his 2010 trial testimony,[7] on an issue concerning the sequence in which the Defendants entered the residence.  Defendant Motyka admitted that the testimony he had given at this trial and the testimony given at the 2010 criminal trial were inconsistent, and he attributed that disparity to a mistaken present recollection.  On another occasion, the Plaintiffs' counsel sought to impeach Defendant Motyka's testimony here with his apparently inconsistent 2010 trial testimony concerning when he heard yelling from inside the residence.  Defendant Motyka's response was to thank Plaintiffs' counsel for "refreshing my memory."  On a third occasion, Defendant Motyka was confronted with testimony he gave at the 2010 trial in which he apparently stated that the situation inside the residence was "cordial" at one point in time, and Defendant Motyka explained here that that testimony was specifically addressing relations between another officer and one of the Plaintiffs.   On yet another occasion, counsel used the

---

offered or received into evidence and Defendant Motyka never described the contents of the report nor testified who may have acted upon its contents and how.

[7]      The Court's records do not indicate that the transcript of the 2010 trial was admitted as an exhibit.

2010 testimony transcript to refresh Defendant Motyka's recollection of whether Defendant Valdez made it all the way into the living room.

The record appears to reflect that Defendant Motyka also testified on or about August 13, 2009 (or possibly August 7, 2009), at a "pretrial motions hearing" in Daniel III and Nathan's criminal case.  As with the 2010 criminal trial, the testimony Defendant Motyka gave at the motions hearing was transcribed and used to impeach Defendant Motyka's testimony in this trial.  But, like the trial transcript, the transcript from the motions hearing was not offered as an exhibit and thus, the record here contains only indirect references as to what Defendant Motyka's 2009 testimony may have been.  Defendant Motyka appeared to agree with the Plaintiffs' counsel here that the transcript from the motions hearing referenced Defendant Motyka testifying that he punched Nathan Martinez in the jaw and that he saw all four Plaintiffs punching Defendant Valdez about the head and shoulders.

From this record, it is clear that the jury's response to Question 7 on the verdict form -- finding that Defendant Motyka made statements that caused the criminal prosecution of Daniel III and Nathan to proceed[8] -- was supported by the evidence.  Although the record does not indicate that Defendant Motyka caused the criminal prosecution of the Plaintiffs to be initiated, malicious prosecution claims may be brought against persons who were not involved with the initiation of criminal charges.  A witness who gives testimony, unsupported by probable cause, may be liable for malicious prosecution if that witness' testimony causes the prosecution to continue.  *Pierce v. Gilchrist*, 359 F.3d 1279, 1291-92 (10th Cir. 2004).  Here, the record reflects

---

[8]     The Court observes that the jury instruction it gave on the malicious prosecution claim, to which neither party objected, asked the jury whether "the criminal case brought against [the Plaintiffs] was <u>brought</u> as a result of oral or written statements made by [the Defendants]." (Emphasis added.)  The Defendants have not argued here that a new trial is warranted because that instruction was somehow defective, and thus, the Court does not consider that question.

that Defendant Motyka made one or more statements that furthered the prosecution of Daniel III and Nathan, possibly including: (i) that the officers entered the residence in a particular sequence; (ii) that Defendant Motyka heard yelling from inside the residence at a particular point in time; (iii) that the communications between one of the officers and one of the Plaintiffs was "cordial" at one point in time; (iv) that Defendant Valdez made it into the living room at one point; (v) that Defendant Motyka punched Nathan in the jaw; and (vi) that Defendant Motyka saw Nathan punching Defendant Valdez at one point in time.

On Question 8, however, the jury apparently found that Defendant Motyka had probable cause for – that is, a reasonable belief in the accuracy of – the statements he made at the time they were given in 2009 and 2010.  Framed as such, it is immediately apparent that there is no inconsistency between the finding that the Defendants lacked probable cause to arrest the Plaintiffs and the first five statements by Defendant Motyka.  The sequence in which officers entered the residence or the fact that Defendant Motyka punched Nathan in the jaw, for example, do not bear in any way on the question of whether the Defendants had probable cause to believe that the Plaintiffs had engaged in criminal assaults upon police officers.  Because the jury's finding on Question 7 might arguably have included only one or more of the first five statements, a finding that Defendant Motyka reasonably believed in the truth of those statements is in no way inconsistent with a finding that the Defendants lacked probable cause to arrest the Plaintiffs.[9]

---

[9]      Arguably, the sixth statement – that Defendant Motyka saw Nathan punching Defendant Valdez at one point in time – could superficially be perceived as inconsistent with the jury's finding that the Defendant Motyka lacked probable cause to arrest Nathan.  After all, if Defendant Motyka reasonably believed he saw Nathan punching Defendant Valdez, Defendant Motyka might have had probable cause to believe that Nathan had committed an assault on Defendant Valdez and thus had probable cause to effect Nathan's arrest.

For the verdicts to be inconsistent, one would first have to assume that the jury included this statement among those that they found Defendant Motyka to have made during the criminal prosecution.  Even so, the Court nevertheless finds that the jury's verdict can still be reconciled.

Accordingly, the Court cannot say that the jury's verdicts on Claim 3 and Claim 4 as to

Defendant Motyka are so inherently inconsistent that a new trial is required.

A similar, albeit simpler, analysis applies to Defendant Jackson.  The jury found that

Defendant Jackson made statements that furthered the criminal prosecutions of Daniel III and

Jonathan Martinez, but did not make statements regarding Nathan or Daniel Jr.[10]  As with

---

Defendant Motyka's 2009 testimony apparently did not address the events that precipitated the Plaintiffs, including Nathan, punching Defendant Valdez.  Thus, the jury might reasonably have concluded that Defendant Motyka could have reasonably described seeing the punching occurring, yet still lack probable cause to believe that such punching constituted an assault. Colorado law recognizes that an individual may resist an unlawful application of force by a police officer by responding with force of their own.  C.R.S. § 18-1-704.  Although the Court did not instruct the jury on this provision of law, the Plaintiffs counsel alluded to the same notion during the questioning of Defendant Motyka, suggesting to him that "you can understand the concept of provocation, right?"  It may be that the jury concluded that the jury concluded that Nathan had a legal justification to punch Defendant Valdez, as he was observed doing by Defendant Motyka, and yet because Defendant Motyka did not see the events preceding Nathan's punch, Defendant Motyka lacked knowledge as to whether Nathan's punch had been provoked by Defendant Valdez, and thus, lacked probable cause to believe that the punch was a criminal act sufficient to justify arresting Nathan.  Or it may simply be that the jury overlooked this statement about seeing Nathan punch Defendant Valdez when it was deliberating on the malicious prosecution claim.

[10]     Although it may very well be that the jury may have been confused or mistaken in this regard, given that Daniel III and Nathan were tried simultaneously, there is at least a conceivable explanation for a portion of the jury's findings.  The record reflects that Defendant Jackson was the officer who arrested Daniel III, and it is undisputed that Daniel III was later the subject of criminal prosecution.  Although, as noted herein, there is absolutely no evidence in the record as to whether Defendant Jackson participated in that criminal prosecution at all, the jury may have reasonably inferred that the police officer who effectuated the arrest of Daniel III would have played at least some role in Daniel III's prosecution.  Thus, the jury may have concluded that the record supported an inference that Defendant Jackson must have participated in Daniel III's prosecution in some abstract way, but found no evidence that he would have made any statements furthering Nathan's simultaneous prosecution.

There is less of an explanation for the jury's finding that Defendant Jackson made statements furthering the criminal prosecution of Jonathan Martinez.  Neither Defendant Jackson nor Jonathan testified as to Defendant Jackson being involved in that proceeding, and although the Plaintiffs' counsel used Exhibit 165 – a Petition in Juvenile Delinquency concerning Jonathan, which lists Defendant Jackson as one of the potential witnesses – to refresh Jonathan's recollection on an unrelated point, that exhibit was not offered or admitted and was not considered by the jury.  Ultimately, however, even a factually-unsupported finding by the jury

Defendant Motyka, there is no general summary of the statements or testimony that Defendant Jackson gave during the criminal prosecutions. Indeed, as best the Court can determine, neither party adduced <u>any</u> facts from Defendant Jackson, Daniel III, or Jonathan about Defendant Jackson's testimony during the criminal proceedings in this action.  Because there is no evidence of the actual statements that Defendant Jackson may have made during these prosecutions, there is no evidence to suggest that those statements – found by the jury to have been supported by probable cause – are somehow inconsistent with the conclusion that Defendant Jackson lacked probable cause to arrest Daniel III.  Indeed, the jury's verdict regarding the malicious prosecution claim can be understood as a finding that the Plaintiffs simply failed to carry their burden of proving that Defendant Jackson's statements during the criminal prosecution were made without probable cause, perhaps because the Plaintiffs failed to provide evidence of what those statements even were.

Accordingly, the Court finds no inconsistency between the jury's verdicts as to Defendant Jackson on Claims 3 and 4.

(ii).  <u>Unlawful entry and probable cause</u>

This argument focuses on a narrower question.  On Claim 1, Unlawful Entry, the jury found that Defendant Motyka entered the Plaintiffs' residence without probable cause or consent, but found that the Defendants had proven an affirmative defense that Defendant Motyka's  entry was justified by exigent circumstances.  The Defendants argue that the exigency in question was

---

regarding Defendant Jackson's involvement in Jonathan's criminal case is irrelevant.  There is no contention that the jury's findings – that Defendant Jackson made statements in <u>Jonathan</u>'s prosecution but that such statements were supported by probable cause – is necessarily inconsistent with the jury's finding that Defendant Jackson lacked probable cause to arrest <u>Daniel III</u>.  Although the Defendants argue that the verdict form evidences generalized jury confusion, that confusion is immaterial in the absence of an actual inconsistency in the verdicts that were returned.

because Defendant Motyka "saw Officer Valdez being assaulted by the Plaintiffs."  Thus, the

Defendants argue, "if . . . Defendant Motyka's entry into the home was justified by . . . the

immediate need to protect the life or safety of Defendant Valdez[,] then probable cause

necessarily existed for Defendant Motyka's arrest of Nathan Martinez."

This argument suffers from a fatal logical flaw because it depends on an unstated premise

-- that "if an exigency exists, police therefore have probable cause to arrest the person creating

the exigency" – that is false.  The Court will assume, for the moment, that Defendant Motyka did

indeed see Defendant Valdez under attack and that that was a valid reason for Defendant Motyka

to enter the residence in order to quell the altercation.  But for the same reasons discussed above,

the mere fact that Defendant Motyka saw Nathan (among others) striking Defendant Valdez is

not enough, of itself, to amount to probable cause to thereafter arrest Nathan for assault.  If

Nathan was striking Defendant Valdez lawfully in self-defense – because Defendant Valdez had

unlawfully initiated the physical contact – his striking of Defendant Valdez would be lawful and

Defendant Motyka would not have cause to arrest Nathan, even though Defendant Motyka

entered the premises under exigent circumstances to break up the altercation.[11]  Because cause to

make an arrest does not follow, inexorably, from the right to enter a premises due to exigency,

---

[11]      Admittedly, the somewhat lenient standard of "probable cause" necessary to justify an
arrest does not require Defendant Motyka to have omniscience about how the altercation began.
Defendant Motyka is permitted to act on the circumstances as they appeared to a reasonable
police officer under the circumstances.  But because Defendant Motyka testified that he could
not recall the circumstances of how the altercation began, the jury could have concluded that it
would be unreasonable for a police officer coming upon a fistfight to necessarily assume,
without further evidence, that one party started the fight over the other.  Moreover, the jury's
finding on the false arrest claim – that all of the Defendants lacked probable cause to arrest the
Plaintiffs – suggests that the jury found that the Defendants either lied amongst themselves about
the circumstances leading up to the fight or failed to reasonably perceive or investigate those
circumstances.

the Defendants' argument that there is an inconsistency between the jury's verdict as to

Defendant Motyka on Claims 1 and 4 is without merit.

(iii). <u>Malicious Prosecution and Continuing Malicious Prosecution</u>

Finally, the Defendants argue that there is an inherent inconsistency between the jury's

finding that Defendant Valdez did not act with malice when he made unsupported statements

against Jonathan Martinez, such that he was not liable for malicious prosecution, but that he

engaged in "continuing malicious prosecution" by maliciously making unsupported statements

that prolonged Jonathan's prosecution.

The record reflects that Jonathan was initially charged with Assault in the Second Degree

on a Police Officer, a felony.  Defendant Valdez testified that he completed a "probable cause

statement" after the incident, but that the decision as to what charges to file was made

independently by a District Attorney.  Although the Plaintiffs attempted to impeach Defendant

Valdez about whether he had discussions with the District Attorney prior to the initial filing of

charges, the substantive evidence in the record is unrebutted that it was a District Attorney, not

Defendant Valdez, who made the initial decision to charge Jonathan.

However, Jonathan's testimony established that Defendant Valdez did eventually appear

and testify in a court hearing in the case against Jonathan.  Jonathan had been detained at a

juvenile correctional facility following the incident, and the hearing apparently concerned

whether Jonathan should be released pending trial.  According to Jonathan, Defendant Valdez

testified at the hearing that he was "terrified" of Jonathan and he opposed Jonathan's release.

Jonathan was ultimately released, but was subject to a restraining order concerning Defendant

Valdez, the contents of which were not otherwise described.

Jonathan brought two separate malicious prosecution claims.  The initial malicious prosecution claims by all Plaintiffs – Claim 4 – concerned the Plaintiffs' contention that the Defendants collaborated on a falsified story that would justify criminal charges being initiated against each of the Plaintiffs.  As the Court understands it, Claim 4a, Jonathan's "Continued Malicious Prosecution" claim, was based on Defendant Valdez's efforts to oppose Jonathan's release on bond – that is, that Defendant Valdez maliciously sought to prolong Jonathan's confinement.  *See Novitsky v. City of Aurora*, 491 F.3d 1244, 1258 (10th Cir. 2007) (elements of malicious prosecution under § 1983 are that "the defendant caused the plaintiff's continued <u>confinement</u> or prosecution . . .") (emphasis added).  In this sense, the jury's verdict is easily reconciled and consistent with the evidence: it apparently found that Defendant Valdez mischaracterized Jonathan's actions during the incident in the course of completing his "probable cause statement" – in other words, that Defendant Valdez made statements without probable cause that led to Jonathan's initial prosecution.  However, the jury appears to have concluded that Defendant Valdez did so mistakenly or out of confusion or that he otherwise acted without malice; hence, the jury returned a verdict in his favor on Claim 4, the malicious prosecution claim arising from the initial filing of charges.  On the other hand, the jury apparently concluded that Defendant Valdez's statement at Jonathan's bond hearing – that Defendant Valdez was "terrified" of the 15-year old – was both false and a malicious attempt by Defendant Valdez to prevent Jonathan's release from custody.  Although Jonathan was eventually released despite Defendant Valdez's efforts, that release was somewhat circumscribed by a restraining order that was imposed at Defendant Valdez's request, establishing an injury (however slight) to Jonathan sufficient to support a finding of Continued Malicious Prosecution on Claim 4a.

Accordingly, the Court finds no merit in the Defendants' contention that the jury's verdict is so internally inconsistent that a new trial is warranted.[12]

## 2. Actual damage award

The Defendants argue that either a new trial or remittitur is required because the compensatory damages awarded by the jury were excessive. Remittitur or a new trial are appropriate remedies to cure a jury's compensatory damage award that is "so grossly excessive as to shock the judicial conscience" or if it "raise[s] an irresistible inference that passion, prejudice, corruption, or other improper influence invaded the trial." *Prager v. Campbell County Mem. Hosp.*, 731 F.3d 1046, 1061 (10th Cir. 2013).

The Court addresses the compensatory awards as categories. The first category consists of those damage awards that can only be attributed to the Unlawful Entry claim. All four Plaintiffs asserted this claim against all four Defendants, but the jury found that only Defendants Martinez and Valdez were liable to the Plaintiffs. Through process of elimination, it is possible to ascertain that the awards in favor of certain Plaintiffs against certain Defendants can only be tied to the Unlawful Entry claim. Specifically, (i) the award of $ 25,000 each to Nathan, Daniel III, and Jonathan against Defendant Martinez, and (ii) the award of $ 25,000 each to Nathan and Daniel III, and the award of $ 40,000 to Daniel Jr. against Defendant Valdez, can only be attributed to the Unlawful Entry claim.

These awards are supported by substantial evidence: the record reflects that all four Plaintiffs were residents of the home, had possessory and privacy interests against intrusion into the home, and that all four were present when the Defendants unlawfully entered. All four

---

[12]    Because the Court finds no internal inconsistency, it need not address the Defendants' argument that mistakes by the jury in answering questions they were not required to consider constitutes further evidence of "jury confusion."

Plaintiffs testified to being upset by the intrusion, thus warranting some award of damages as compensation for such upset.  (The Court assumes that the higher award to Daniel Jr. reflects his status as head of the household and his seemingly greater privacy interest in controlling the flow of visitors into the home.)

The Court cannot say that these awards shock the judicial conscience.  They are, to be sure, generous awards for an intrusion that caused minimal property damage and lasted a fairly short period of time. At the same time, the Court cannot diminish the emotional distress that any citizen would feel when police officers forcibly entered one's residence without justification or consent.  The unreasonableness of this conduct is only magnified by the jury's apparent conclusion that the Defendants tendered a spurious justification for the action (that they were merely attempting to perform a "knock-and-talk") and the evidence that they overlooked pre-existing, readily-available information about a recent change in residents that would have dissipated, if not entirely ameliorated, the need for the visit itself or a forceful police presence during it.  Under all these circumstances, the Court cannot say that the compensatory awards to these Plaintiffs on the Unlawful Entry claim shock the judicial conscience or reflect improper jury decisionmaking.

The second category of awards are those that are, in large part, for False Arrest.  Each of the Defendants was found liable for falsely arresting the individual Plaintiff they interacted with. Three of those awards can be meaningfully addressed here:

• Defendant Martinez as to Daniel Jr., $ 60,000 (which, presumably, also includes an award for Defendant Martinez's unlawful entry into the residence – given the jury's awards on the other Unlawful Entry claims, it may be fair to assume that the jury valued the damages flowing from the false arrest itself at between $ 20,000 and $ 35,000),

• Defendant Motyka as to Nathan, $ 75,000, and

• Defendant Jackson as to Daniel III, $ 40,000.

It is undisputed that each of these Plaintiffs were arrested at the home, taken to the police station for booking, then detained in the Denver Jail for several hours until they were released on bond. The Plaintiffs' injuries were primarily in the form of emotional distress, anxiety, and embarrassment.[13] Once again, the Court cannot say that these awards are so excessive as to shock the conscience. Being unlawfully arrested and detained can readily be expected to result in considerable emotional distress and anguish for law-abiding citizens. Taking the evidence in the light most favorable to the Plaintiffs, the arrests occurred abruptly, forcefully, and without prior warning, rather than as the culmination of a lengthy standoff or prolonged interaction with the police, making the resultant stress all the more significant. In addition to the stress, anxiety, and fear that a improperly-arrested individual feels, the Plaintiffs testified about further emotional injury in the form of stigma in the eyes of family and neighbors, the humiliation of having to rely upon others to arrange bail, and the fear of further assault while incarcerated. Thus, under all of these circumstances, although the Court finds the jury's awards to be generous (particularly the award to Nathan), the Court cannot say that they are so "grossly excessive" as to require relief.

---

[13] Although certain Plaintiffs claimed to suffer physical injuries in the course of being arrested, the Court is not inclined to consider those injuries when evaluating the appropriateness of the damage awards because the jury also concluded that the Defendants did not use excessive force against the Plaintiffs during the encounter. The Court also declines to consider the anxiety that the Plaintiffs may have felt upon learning of the serious criminal charges actually brought against them and the potentially lengthy prison sentence each could face. The Plaintiffs particularly stressed the emotional distress that results from being charged with a crime carrying a lengthy minimum prison sentence, but the jury found that none of the Defendants were liable for Malicious Prosecution in regards to the initial charges brought against the Plaintiffs. Thus, any emotional distress felt by the Plaintiffs relating to the potential sentences they faced are not injuries for which the Defendants are liable.

Finally, there is the award of $ 200,000 in favor of Jonathan against Defendant Valdez. That award reflects compensation for three separate wrongs by Defendant Valdez: unlawful entry, the false arrest of Jonathan, and malicious prosecution arising from Defendant Valdez's subsequent testimony in opposition to Jonathan's release on bail. (As above, assuming the jury's verdict roughly tracks the awards to other Plaintiffs on the Unlawful Entry and False Arrest claims, it may be that the $ 200,000 can be allocated as approximately $ 25,000 for Unlawful Entry, $40,000 to $70,000 for False Arrest, and $ 105,000 to $135,000 for Continued Malicious Prosecution.)

Whether construed as a whole or as the hypothetical sum of its component parts, the award is considerably higher than any of the other awards in this case. But to some extent, the circumstances involving Defendant Valdez and Jonathan warrant a somewhat higher award than those given to other Plaintiffs. At the time of the events, Jonathan was 15 years old and slight of stature, making him more vulnerable to injury than the other Plaintiffs. By most accounts, Jonathan was the first of the Plaintiffs to be physically restrained by one or more of the Defendants. After being booked, Jonathan was not released on bail like the other Plaintiffs; instead, he was taken to a juvenile corrections facility and held for approximately a week. All of these facts suggest that Jonathan's injuries could warrant a more significant damage award than that received by the other Plaintiffs. But perhaps most significant is the fact that, approximately a week after the incident – after adequate time for deliberation and reflection and time for tempers to cool – Defendant Valdez nevertheless testified at Jonathan's bail hearing, seeking (maliciously, as the jury found) to prevent Jonathan from being released on bail. In such circumstances – an otherwise law-abiding 15-year old, falsely arrested and detained for a week, thereafter learning that a police officer was attempting to prevent him from being released on

bond[14] – one would expect that the emotional distress suffered by Jonathan would be considerably more severe than that suffered by the other Plaintiffs.  Perhaps even more so than the other awards, the jury's award in Jonathan's favor is undoubtedly generous, but given the considerable discretion vested in the jury and the particular circumstances presented here, the Court cannot say that the award crosses the line between generous and "grossly excessive."

Accordingly, the Court denies the Defendants' motion for new trial on damages or remittitur.[15]

### 3. Punitive damage award

The Defendants argue that the jury's award of punitive damages, totaling $ 1.25 million, is excessive, particularly when measured against the jury's award of actual damages in the amount of $ 540,000.  The Defendants argue that the punitive damage award runs afoul of the Due Process clause of the U.S. Constitution.

The Due Process clause prohibits the imposition of grossly excessive punishments on a tortfeasor.[16]  *Jones v. United Parcel Serv.*, 674 F.3d 1187, 1206-07 (10th Cir. 2012).  In analyzing

---

[14]      It is worth noting, of course, that despite Defendant Valdez's efforts, Jonathan was released on bond, albeit subject to ankle monitoring and a restraining order that prevented him from going near Defendant Valdez.  Thus, Jonathan's injuries from the Continuing Malicious Prosecution claim would mostly be limited to the emotional distress suffered by Jonathan during the period of time between which he heard Defendant Valdez's testimony opposing his relief and the time he learned he was nevertheless granted bail.

[15]      The Court summarily rejects certain arguments by the Defendants – *e.g.* that the Plaintiffs failed to mitigate their damages by not seeking post-incident counseling for emotional distress. This defense was presented to and considered by the jury, and any findings by the jury on that issue are necessarily incorporated into the verdict.  Nor does the Court find any basis for questioning the jury's awards merely because the Plaintiffs provided only their own testimony about the nature and extent of their emotional injuries.

[16]      In *Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1111 (10th Cir. 2004), the court explained that a defendant can also challenge a punitive damage award under the common law (*i.e.* not by reference to the Due Process clause).  A common law challenge invokes the same "shocks the conscience" or "improper influence" standard the Court cited with regard to the

the constitutionality of a punitive damage award, the Court examines the factors articulated by

the U.S. Supreme Court in *BMW of N. America, Inc. v. Gore*, 517 U.S. 559, 574-75 (1996). *Id.*

at 1207. Those factors are: (i) the degree of reprehensibility of the defendant's conduct; (ii) the

disparity between the actual harm suffered by the plaintiff and the punitive damage award; and

(iii) the difference between the punitive damage award and the civil penalties authorized or

imposed in comparable cases. *Id.* The Court will examine each in turn.

A. <u>Reprehensibility</u>

The degree of reprehensibility is "the most important indicium of the reasonableness of a

punitive damage award." *Gore*, 517 U.S. at 575. In examining this factor, the Court considers a

number of sub-factors, including whether the harm was physical or merely economic, whether

the defendant acted with indifference to the health and safety of others, the financial

vulnerability of the plaintiff, whether the conduct involved repeated actions or was an isolated

incident, and whether the harm was the result of intentional action or mere accident. *Jones*, 674

F.3d at 1207, *citing State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2004).

The jury awarded different amounts of punitive damages against each of three

Defendants (the jury awarded no punitive damages against Defendant Jackson), and thus, it is

necessary to address the question of reprehensibility separately for each.

Turning first to Defendant Motyka, the Court encounters an early obstacle. The jury

awarded punitive damages to all four Plaintiffs against Defendant Motyka, in the amount of

$62,500 for each Plaintiff. But the jury found Defendant Motyka liable only on one substantive

claim – False Arrest – that was asserted only by Plaintiff Nathan Martinez. As to the claims for

which all four Plaintiffs were claimants against Defendant Motyka – Unlawful Entry and

---

compensatory award. *Id.* To the extent the Defendants raise this type of challenge in addition to
a constitutional challenge, the Court's conclusion would not differ from that set forth herein.

Malicious Prosecution – the jury found in favor of Defendant Motyka.[17]  Thus, because Defendant Motyka has no liability as to Plaintiffs Daniel Jr., Daniel III, and Jonathan Martinez on any claim asserted by them, the jury's award of punitive damages (and, for that matter, the compensatory damages awarded as well) in their favor against Defendant Motyka cannot stand.

Considering the reprehensibility of Defendant Motyka's unlawful conduct as to Nathan – falsely arresting him – under the factors listed above, the conduct is of a fairly mild degree of reprehensibility.  The false arrest of Nathan resulted in him being taken to the police station and processed.  Although Nathan was subsequently charged with a crime and prosecuted , the jury's verdict does not hold Defendant Motyka responsible for that decision.  Thus, the scope of Nathan's injuries are limited to  the inconvenience of being falsely arrested for assault, taken to a police station, and booked.  Although not solely economic in nature, those injuries are not necessarily "physical" either; the distress and anxiety that a falsely arrested citizen suffers are more of an emotional nature.  Defendant Motyka's act of falsely arresting Nathan occurred on a single occasion.  The record reflects that the Plaintiffs generally, and Nathan specifically, are of limited financial means.  The finding of false arrest necessarily required the jury to reject Defendant Motyka's contention that he acted reasonably and in good faith based on what he perceived to be happening during the altercation, and the jury's finding that he acted in reckless disregard of Nathan's rights elevates this case somewhere above the label of "mere accident." Taken as a whole, the factors suggest that Defendant Motyka's conduct towards Nathan, while

---

[17]     The Plaintiffs argue that because Defendant Motyka was the supervising officer during the incident, he may be held liable for constitutional violations committed by the other officers under a "failure to intervene" theory.  The Plaintiffs never articulated that distinct theory of liability in the pleadings or the Pretrial Order, never argued it at trial, and never presented it to the jury.  Thus, the Court declines to unilaterally substitute a "failure to intervene" claim for those claims on which the jury found for Defendant Motyka.

certainly wrongful and worthy of discouragement, was of comparatively minor consequence, and thus, supports only a modest punitive damage award.

Defendant Valdez's liability here is multi-faceted.  As to Plaintiffs Daniel Jr., Daniel III, and Nathan, Defendant Valdez is liable only for unlawfully entering the residence and disrupting these Plaintiffs' privacy rights.  Although the unlawful intrusion of police into a home can certainly give rise to anxiety and a feeling of insecurity, the injuries stemming from this action tip more to the economic side of the equation rather than the physical side, even more so than the injuries that result from a false arrest.  Such conduct occurred on a single occasion. The jury rejected Defendant Valdez's argument that the entry was the result of a mistaken belief that Daniel Jr. had consented to the officers' entry, and apparently adopted the Plaintiffs' argument that Defendant Valdez intended to enter the home regardless of Daniel Jr.'s actions, suggesting some degree of intentional misconduct.  Taken as a whole, the conduct of Defendant Valdez as to Daniel Jr., Daniel III, and Nathan is of fairly mild reprehensibility, warranting only a fairly mild punitive damage award.

As to Jonathan, Defendant Valdez's conduct is more significant.  In addition to unlawfully entering the residence Jonathan shared with his family, Defendant Valdez falsely arrested Jonathan and later exacerbated Jonathan's prosecution by attempting to prevent him from being released on bond.  Unlike the wrongs committed by Defendant Valdez as to the other Plaintiffs, his wrongs as against Jonathan were continuing in nature, with Defendant Valdez's testimony opposing Jonathan's release on bail occurring approximately a week after the incident in the home, giving time for tempers to cool and reason to prevail.  In addition, the jury's verdict on the Continuing Malicious Prosecution claim expressly found that Defendant Valdez acted maliciously towards Jonathan.  By continuing his intentional, wrongful conduct as to Jonathan

after having had time for deliberation, Defendant Valdez evidenced a higher degree of reprehensibility and thus, is susceptible to a higher punitive damage award.

Finally, Defendant Martinez falls somewhere in between. Like Defendant Valdez, Defendant Martinez was found liable to all four Plaintiffs for unlawfully entering their home, although the record reflects that he did so following behind Defendant Valdez, thus moderating the reprehensibility of his conduct slightly. He was found to have falsely arrested Daniel Martinez, Jr., but like Defendant Motyka, was not found to have maliciously prosecuted any of the Plaintiffs. As with the other Defendants, the conduct underlying the unlawful entry and false arrest claims are of a fairly mild degree of reprehensibility, warranting only a fairly mild punitive damage award.

### B.  Disparity between actual harm and punitive award

Next, the Court examines the ratio of a punitive damage award to the compensatory award made by the jury. There are no bright-line ratios or concrete rules that limit the extent to which punitive damages may multiply actual damage awards, although the Supreme Court has suggested that "few awards exceeding a single-digit ratio . . . will satisfy due process" (although it stated that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety"). *State Farm*, 538 U.S. at 425. In examining this factor, the Court should keep in mind the degree of actual harm suffered by the Plaintiffs and awarded by the jury: a particularly generous actual damage award might justify only a small ratio of actual damages to punitive ones, whereas a case involving compensatory damages of minimal economic value could support a more generous punitive award. *Id.*. Ultimately, this factor is one that requires consideration of the entire facts and circumstances of the case. *Id.*

Once again, it is necessary to examine the punitive damage award against each Defendant separately.  Beginning with Defendant Motyka, once the Court strips away the improper awards to Plaintiffs other than Nathan, the Court is left with the jury's award of $ 75,000 in actual damages to Nathan and $ 62,500 in punitive damages.  Certainly, the less-than-1:1 ratio between the two does not "push the boundaries of due process requirements."  *Jones*, 674 F.3d at 1207-08.  As to Defendant Valdez, the punitive awards of $ 100,000 each Plaintiff reflect a ratio of punitive damages to compensatory damages of 4:1 for Nathan, Daniel III, and Jonathan, and 1.6:1 as to Daniel Jr.   The former sits at the edge of what *State Farm* suggests is "close to the line" of impropriety (although apparently not over it), although the latter is certainly within the range permitted under *Jones*.  The award against Defendant Valdez in favor of Daniel Jr., Nathan, and Daniel III similarly falls at a ratio of 2.5:1 (as to Daniel Jr.) or 4:1 (as to Nathan and Daniel III), while the award to Jonathan grants punitive damages at a ratio of 1.5:1 compared to compensatory damages.    Thus, none of the punitive damages awarded reflect a facially-excessive ratio to actual damages awarded.

However, that does not appear to be the end of the inquiry on this factor.  In *Jones*, the 10th Circuit considered a jury verdict in favor of an employee who had claimed that his termination was unlawfully retaliatory.  The jury awarded the employee $630,000 in compensatory damages and $ 2 million in punitive damages.  The 10th Circuit found that the ratio of compensatory to punitive damages was "probably" sufficient to survive constitutional scrutiny.  674 F.3d at 1208.  But it found that because "the jury awarded Jones a substantial compensatory damage award in light of the injuries he had suffered," the punitive damage award "was grossly excessive."  *Id.*  Instead, it concluded that "a punitive damage award equal to the compensatory damage award is the maximum constitutionally allowable under these particular

facts." *Id.*; *see also State Farm*, 538 U.S. at 425 (suggesting that "when compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee").

As the preceding discussion reflects, it is this Court's opinion that the Plaintiffs were the beneficiaries of fairly generous compensatory awards.  There is no indication that any economic injuries suffered by the Plaintiffs went un-remedied and the Plaintiffs' non-economic injuries arising from the successful claims are almost entirely emotional in nature.  The record does not reflect that these emotional injuries have been debilitating in character or prompted the Plaintiffs to seek professional care, leaving the conclusion that the Plaintiffs manage them in the same way that any other person manages the lingering emotional effects of an upsetting event.  Without intending to diminish in any way the seriousness of police officers committing constitutional violations of the type described here or the need for punitive damages to punish the Defendants for such conduct, the Court is compelled to conclude that the compensatory awards to the Plaintiffs are so substantial and complete that an award of punitive damages at a ratio of more than 1:1 would be excessive.  Thus, the Court reduces the punitive damages award to the Plaintiffs to match, but not exceed the compensatory awards.

3. Comparable cases

The Defendants cite to a variety of published cases in which courts have set aside smaller punitive damage awards in what would appear to be more egregious circumstances.  The Plaintiffs cite cases in their response in which considerable punitive damage awards were upheld in various false arrest cases.

Both parties appear to have missed the mark.  This factor does not invite a race to the law library to find verdicts upheld or overturned in cases involving similar claims.  As discussed in

*BMW*, this factor is premised upon the notion that "<u>legislative</u> judgments concerning appropriate sanctions for the conduct at issue" constitute an alternative "indicium of excessiveness." 517 U.S. at 583 (emphasis added). Thus, in *BMW*, a case involving deceptive trade practices, the Court considered "the maximum civil penalty authorized by the Alabama Legislature for a violation of its Deceptive Trade Practices Act," finding that $ 2,000 penalty to be disproportionate to the "multimillon dollar penalty" assessed by the jury in that case. *Id.* at 584. Although *Jones* refers to a handful of reported cases it deems "analogous," it does so mostly in support of its conclusion that it is appropriate to reduce punitive damages when the compensatory award has been found to be substantial, not for the purpose of comparing cases claim-for-claim or dollar amount-for-dollar amount. 674 F.3d at 1208.

Even assuming that this factor required consideration of comparable <u>cases</u>, this Court sees little value in dissecting individual cases having little factual relation to the instant matter. *See Smith v. Ingersoll–Rand Co.*, 214 F.3d 1235, 1252 (10th Cir.2000) ("We are hesitant to accept the invitation to undertake this comparative inquiry [as] such comparisons yield no insight into the evidence the jurors heard and saw or how they used it during their deliberations"). Having reviewed the cases cited by both parties, as well as its own independent research, the Court finds that there is no overwhelming consensus among courts that the particular amounts of damages awarded here are or are not excessive under similar circumstances. Because the Court is ultimately reducing the punitive damage award for other reasons, this factor has minimal significance in the analysis.[18]

---

[18] The Defendants also argue that the Court should take into account the Defendants' ability to pay a substantial punitive damage award. Although that factor is not one expressly identified in cases like *BMW* and *Jones*, the Court might be inclined to consider it in appropriate cases. However, the Defendants offer little evidence on this point, citing only to the salary ranges for Denver police officers. They do not address the particular financial situations of any of the

Thus, the Court concludes that the jury's punitive damages awards violate the Due

Process clause and must be reduced.  Finding that the maximum permissible punitive award is

one which matches the compensatory damage award, the Court reduces the awards to the

following:

| Plaintiff | Type of Damages | Defendant Martinez | Defendant Motyka | Defendant Jackson | Defendant Valdez |
|---|---|---|---|---|---|
| **Daniel Jr.** | Actual | $ 60,000 | $0 | $0 | $ 40,000 |
| | Punitive | $ 60,000 | $ 0 | $ 0 | $ 40,000 |
| | **Total** | **$ 120,000** | **$ 0** | **$ 0** | **$ 80,000** |
| **Nathan** | Actual | $ 25,000 | $75,000 | $ 0 | $ 25,000 |
| | Punitive | $ 25,000 | $ 62,500 | $ 0 | $ 25,000 |
| | **Total** | **$ 50,000** | **$ 137,500** | **$ 0** | **$ 50,000** |
| **Daniel III** | Actual | $25,000 | $0 | $ 40,000 | $ 25,000 |
| | Punitive | $ 25,000 | $ 0 | $ 0 | $ 25,000 |
| | **Total** | **$ 50,000** | **$ 0** | **$ 40,000** | **$ 50,000** |
| **Jonathan** | Actual | $ 25,000 | $ 0 | $ 0 | $ 200,000 |
| | Punitive | $ 25,000 | $ 0 | $ 0 | $ 200,000 |
| | **Total** | **$ 50,000** | **$ 0** | **$ 0** | **$ 400,000** |

Accordingly, the Defendants' Motion for New Trial or Remittutr is granted in part and

denied in part as set forth above.

---

individual Defendants, nor discuss the availability of insurance, indemnification agreements, or
other sources that might offset, in part or whole, the damage awards here.  Indeed, in their reply
brief, the Defendants concede that the City and County of Denver has agreed to indemnify them
for punitive damages awarded against them.  Thus, the Court finds that consideration of the
Defendants' financial situations does not materially affect the analysis herein.

### B.  Motion for Prejudgment Interest

The Plaintiffs move for an award of prejudgment interest "from the date of the constitutional violations to the date of entry of final judgment."  They acknowledge that such relief is not available as of right, but rather, may be awarded at the discretion of the trial court. *Zuchel v. City and County of Denver*, 997 F.2d 730, 746 (10th Cir. 1993).  In assessing a request for prejudgment interest, the Court first considers whether an award of prejudgment interest would serve a compensatory function, then it considers whether the equities would preclude such an award.  *Id.*

Turning to the compensatory question, the purpose of prejudgment interest is to compensate the wronged party for being deprived of the monetary value of the loss from the time of loss to the entry of judgment.  *Id.*   The Court will assume, without necessarily finding, that the jury did not necessarily include prejudgment interest as a component in any of its damage awards to the Plaintiffs.  Although nothing in the jury instructions specifically precluded the jury from doing so, *compare U.S. Indust., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1257 (10th Cir. 1988), the Plaintiffs did not itemize or request such interest as a component of damages in their closing argument and there is no reason to assume that the jury spontaneously chose to include such sums.

But even if an award of prejudgment interest would serve a compensatory function, the Court finds that the continuing nature of the injuries claimed by the Plaintiffs here makes the equities of granting prejudgment interest unjust here. The Plaintiffs made clear that they were continuing to suffer emotional distress as a result of the incident as of the date of trial in 2014.  For example, Nathan was asked "Is it hard on you emotionally <u>today</u> to be in the courtroom with the defendants?," to which he answered "yes."  (Emphasis added.)  He testified, using the present

tense, that "there is times that one of us will think about what is going on, sometimes when we see other cases on the news, it hurts, not knowing if something happened to them that shouldn't have happened.  And it just brings back memories to us, what happened to us."  The Plaintiffs' counsel returned to that theme in discussing the issue of damages in closing argument.  Again speaking in the present tense, counsel described how Jonathan "doesn't sleep at night.  He watches out the window because he is afraid the police are coming.  He can't sit in this trial. . . . That's the kind of pressure we're talking about.  What is that worth?"

Thus, some portion of the jury's award to the Plaintiffs reflects the value of emotional and other injuries the Plaintiffs sustained on or about January 27, 2009 and the days immediately following it; another portion of the jury's award reflects injuries the Plaintiffs were continuing to sustain as recently as the date of trial in 2014 (and perhaps even after).   Awarding prejudgment interest for the period from January 2009 to the present on the entire actual damage award would result in the Court granting interest on some damages for a period of time before the Plaintiffs actually suffered the corresponding injury.   Arguably, the Court could attempt to dissect the damage awards in an attempt to determine what portion of the award related to injuries suffered in 2009 and what portion related to injuries suffered in 2010, 2012, or 2014, awarding varying amounts of prejudgment interest for each cohort of the award.  But doing so would be an exercise in utter speculation given the mostly unquantifiable nature of the Plaintiffs' injuries. *Compare Barnard v. Theobald*, 721 F.3d 1069, 1078 & n. 12 (9th Cir. 2013) (suggesting that the trial court could at least award prejudgment interest on that portion of an undivided award that likely reflected quantifiable past medical expenses).  Without a meaningful way to apportion prejudgment interest to a holistic non-economic damage award covering injuries sustained over a

lengthy time period – and the Plaintiffs have offered none – the Court is inclined to deny prejudgment interest entirely.

Accordingly, the Plaintiffs' motion for prejudgment interest is denied.

## C. Attorney Fees

Finally, the Court addresses the Plaintiffs' Motion for Attorney Fees.  The Plaintiffs request an award of fees in the amount of $ 477,997.50, reflecting approximately 1,200 hours expended by a variety of lawyers and paralegal staff at varying rates ranging from $ 300 to $ 500 per hour for lawyers and $ 150 per hour for paralegals.  The vast majority of hours sought are claimed by three attorneys:  Mr. Lane, the Plaintiffs' lead counsel, claims approximately 480 hours at $ 500 per hour; Ms. Stimson, the Plaintiffs' second-chair trial counsel, claims 196 hours at $ 350 per hour; and Mr. Mohamedbhai makes two separate claims for fees, one for 178.4 hours at $ 350 per hour for the period of time during which he was associated with Mr. Lane's firm, and a second period of 112 hours at $ 450 per hour for a time period after he left Mr. Lane's firm and established his own practice.

The Defendants do not dispute that the Plaintiffs are prevailing parties or are entitled to an award of a reasonable fee, but contend that the fees claimed by the Plaintiffs are excessive, both in rates claimed and hours spent, and that reductions should be made to the claimed sum for a variety of reasons, including the pursuit of unsuccessful claims (against these and former Defendants) and non-compensable time relating to Mr. Lane's representation of the Plaintiffs in the criminal suit against them.

In determining the reasonable fee that may be awarded, the Court applies the familiar "lodestar" analysis:  first, the Court calculates a "lodestar" figure by multiplying a reasonable hourly rate by the number of hours reasonably incurred by the Plaintiffs' counsel.  *See generally*

*Gisbrecht v. Barnhart,* 535 U.S. 789, 801–02 (2002) ("the 'lodestar' figure has, as its name

suggests, become the guiding light of our fee-shifting jurisprudence"); *Hensley v. Eckerhart,* 461

U.S. 424 (1983). Second, the Court addresses whether that lodestar figure should be adjusted

upwards or downwards based on the particular circumstances of the case, although adjustments

to the lodestar figure are made only in unusual situations. *Pennsylvania v. Delaware Valley*

*Citizens' Council for Clean Air*, 478 U.S. 546, 564–65 (1986). The goal of the exercise is to

produce "an award that roughly approximates the fee that the prevailing attorney would have

received if he or she had been representing a paying client who was billed by the hour in a

comparable case." *Perdue v. Kenny A ex rel. Winn,* 559 U.S. 542 (2010). The applicant seeking

fees bears the burden of demonstrating that the hours expended and rates charged are reasonable.

*Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1201 (10th Cir.1986).

Although the Defendants challenge the fee award claimed by the Plaintiffs on a number

of grounds, the Court will limit its analysis to those issues of the greatest significance. First, the

Court addresses the Plaintiffs' claim for compensation for time spent in handling the Plaintiffs'

criminal defense. The Plaintiffs' counsel in this action, anticipating the potential for a civil suit

against the Defendants, elected to provide *pro bono* criminal representation to the Plaintiffs with

regard to the state charges against them. The Plaintiffs' counsel seeks compensation in this suit

for that criminal defense, explaining that careful presentation of the criminal defense was

necessary to ensure that the Plaintiffs' civil claims would not be unduly compromised by the

outcome of the criminal proceeding. As the Plaintiffs note, there is no general consensus as to

whether fees incurred by counsel providing criminal defense to a person charged with a crime

can be recovered in a § 1983 suit against law enforcement officials for constitutional violations

committed during the arrest. Some courts refuse to award criminal defense fees. *Ventui v.*

*Riordan*, 702 F.2d 6, 9-10 (1st Cir. 1983) ("We conclude that nothing in the language or history of [42 U.S.C.] § 1988 or related case law supports an expansion of the sort that plaintiff urges"); *Fletcher v. O'Donnell*, 729 F.Supp. 422, 429 (E.D. Pa. 1990).  Some courts permit the recovery as a compensable attorney fee.  *See Kerr v. City of Chicago*, 424 F.2d 1134, 1141 (7th Cir. 1970) ("A plaintiff in a civil rights action should be allowed to recover the attorneys' fees in a state criminal action where the expenditure is a foreseeable result of the acts of the defendant"); *see also Beltran Rosas v. County of San Bernadino*, 260 F.Supp.2d 990, 993-95 (C.D. Ca. 2003), *citing Castellano v. Frabozo*, 311 F.3d 689, 710 (5th Cir. 2002), *vacated en banc*, 352 F.3d 939 (5th Cir. 2003).  Others reject the notion that the criminal defense fees are recoverable as attorney fees under 42 U.S.C. § 1988, but suggest that they might be recoverable if presented to and awarded by jury as economic damages suffered by the plaintiff as a result of a constitutional violation.  *See e.g. Greer v. Holt*, 718 F.2d 206, 207 & n. 1 (6th Cir. 1983).  The 10th Circuit has not addressed the issue, directly or otherwise.

This Court agrees with those that have found that 42 U.S.C. § 1988 does not contemplate awards of attorney fees for criminal defense.  That statute permits an award of attorney fees "[i]n any action or proceeding to enforce a provision of" specific civil rights statutes.  42 U.S.C. § 1988(b).  Criminal proceedings are not an "action or proceeding to enforce a provision" of a civil rights statute; at best, they are antecedents to such an "action or proceeding."  Alternatively, the Court finds some wisdom in the *Greer* approach, at least in ordinary cases where the § 1983 plaintiff sustains actual economic damages by paying the fees of criminal defense counsel Such economic losses would properly be the subject of a jury award of damages for a constitutional

violation, just like any other out-of-pocket loss.[19]  The Court is least persuaded by the rationale of making such criminal defense fees compensable: besides requiring an extra-statutory construction of § 1988, this Court is concerned that reflexively hitching success in the criminal proceeding to compensability in the civil proceeding has the potential to generate perverse incentives that could undermine the function of the criminal justice system.[20]  (Moreover, were the Court to consider criminal defense time compensable, the Court would be inclined to make dramatic cuts in the amount of attorney time that could be claimed pursuing discovery of the related civil claims, as the Court would expect defense counsel to have thorough and intimate familiarity with the issues raised in the criminal case.)  Without necessarily adopting any of the approaches, this Court finds that it is not appropriate to grant the Plaintiffs' counsel compensation for the time spent on the Defendants' criminal representation.  The Defendants contend, without dispute from the Plaintiffs, that this time amounts to approximately 215 hours, approximately 57 of which are claimed by Mr. Lane and the remaining 158 hours by Mr. Mohamedbhai.  The total value of this time is $ 83,800, which will be deducted from the amount claimed by the Plaintiffs.

---

[19]      The matter becomes more complicated where, as here, counsel renders a criminal defense *pro bono* in expectation of thereafter representing the civil rights plaintiff in a civil action.  In such circumstances, the civil rights plaintiff has suffered no out-of-pocket loss, and thus has no basis for an economic damage award from a jury.

[20]      Among other things, giving a criminal defense counsel an economic interest in the outcome of the criminal proceeding raises concerns of champerty; poses ethical concerns relating to what is effectively a contingent fee in a criminal case, *see* Colo. R. Prof. Conduct 1.5(c) and Colo. R. Governing Contingent Fees 3(a); creates the potential of a conflict of interest between the attorney (who desires an acquittal/dismissal to advance the potential for a contingent fee recovery in the civil case) and client (who may benefit from accepting a plea agreement or plead guilty to a reduced charge); and could distort efforts to provide for *pro bono* or public representation of indigent criminal defendants (*e.g.* by inducing private counsel to undertake representation of only those criminal defendants who possess a colorable civil rights claim).

Second, the Defendants contend that a substantial reduction in the award sought by the Plaintiffs is appropriate to reflect the limited success achieved by the Plaintiffs. To some extent, the Court agrees. Most notably, the Plaintiffs brought a constellation of claims against the instant Defendants in their individual capacities and a claim against the City and County of Denver under a *Monell* theory. The Court granted summary judgment to the City on the *Monell* claim, thus rendering attorney time devoted solely to that claim to be non-compensable. Moreover, the Plaintiffs achieved only a limited degree of success on their substantive claims. The Plaintiffs asserted four primary categories of claims against the Defendants: (i) Unlawful Entry, in which the Plaintiffs prevailed against only two of the three Defendants named in that claim; (ii) Excessive Force, in which the Defendants prevailed in all respects; (iii) False Arrest, in which the Plaintiffs prevailed in all respects; and (iv) Malicious Prosecution, in which the Defendants prevailed on all four primary claims, but in which Jonathan succeeded against Defendant Valdez on a related claim.

Although the Court agrees with the Plaintiffs that they achieved remarkable success in obtaining generous jury verdicts on the claims on which they succeeded, that is not the measure of success for the purpose of awarding attorney fees. The purpose of reducing a fee claim to reflect partial success is to eliminate compensation for hours spent solely in the pursuit of substantive claims on which the Plaintiffs did not prevail – the Excessive Force claim in its entirety and the Malicious Prosecution and Unlawful Entry claims in part. Here, the Court finds that there was substantial, but not complete, factual overlap between the unsuccessful Excessive Force claims and the successful False Arrest claims. To a large extent, the altercation that gave rise to the Excessive Force claims is the same altercation on which the Defendants predicated the arrest of the Plaintiffs for assault. Thus, only a minor reduction of hours claimed by the Plaintiff

is necessary to eliminate time spent unsuccessfully on the Excessive Force claim. The Court further finds that the Plaintiffs were almost entirely unsuccessful on the Malicious Prosecution claims, although, as noted above, the factual presentation at trial to support those claims was fairly superficial. Although the Plaintiffs were unsuccessful in asserting their Unlawful Entry claim against Defendant Motyka, relatively little time at trial was devoted to addressing facts relating solely to the reasons for Defendant Motyka's entrance (as distinct from facts that related to the reasons for all Defendants' entry). Assuming that the time spent in discovery on these factual matters roughly parallels the amount of time spent at trial presenting them, the Court finds that a wholesale reduction of 10% of the compensable hours claimed by the Plaintiffs would appropriately eliminate hours spent solely in pursuit of unsuccessful claims against the individual Plaintiffs.

The Court also agrees in part with the Defendants that another reduction in the hours claimed is necessary to reflect the Plaintiffs' lack of success on their *Monell* claim. The Plaintiffs argue that Judge Blackburn found that a plaintiff's success on an individual excessive force claim against a City of Denver law enforcement employee, but the plaintiff's loss of its *Monell* claim against the City on summary judgment did not warrant a reduction of the plaintiff's claimed hours spent to reflect partial success because the individual and *Monell* claims were not "distinct in all respects," but rather, were "two sides of the same coin." *See Duran v. Kohler*, D.C. Colo. Civ. Case No. 10-cv-01569-REB-KMT, Docket # 151 (Aug. 25, 2014).

With all the respect due to Judge Blackburn, this Court's analysis differs. A *Monell* claim requires proof of a substantive constitutional violation by an individual state actor, but it also requires additional proof of facts establishing a basis for municipal liability. Such claims often require extensive factual analysis of municipal policies, training, or supervision – facts that

would not necessarily be discovered or presented in a case alleging only individual capacity liability.  However, it is likely that that, notwithstanding their loss on the *Monell* claim, some of the materials Plaintiffs obtained in discovery on that claim proved to be useful at trial, allowing them to cross-examine the Defendants on their apparent non-compliance with City policies and training.  Thus, although the Court finds that some of the time spent by the Plaintiffs on their unsuccessful *Monell* claim is not compensable, the Court finds that only a minor reduction – 5% of the total hours claimed-- is necessary to excise those hours.

Finally, the Court finds various instances in which the number of hours claimed for particular tasks are excessive, such as 47.5 hours for interoffice conferences, nearly 80 hours for preparation of a Pretrial Order, and an additional 76 hours spent on paralegal time preparing trial exhibits.  It being impossible to effectively isolate and identify each instance of excessive hours, the Court finds that another small wholesale reduction in hours is appropriate.  The Court finds that eliminating 5% of the claimed hours as a whole will accomplish this task.

Thus, the Court finds that the appropriate lodestar calculation in this case yields a presumptive fee award of ($ 477,997.50 - $ 83,800) * .8 = $ 315,358.00.   Although the Plaintiffs contend that the lodestar calculation should be enhanced in this case, owing to "the daunting task of seeking justice for an extremely problematic case" and the contingent nature of the fee arrangement, the Court disagrees.  Civil rights cases of this type are fairly common in this District and there appear to be no shortage of counsel willing to bring them.

Accordingly, the Court grants the Plaintiffs' motion for attorney fees in the amount of $315,358.00.  The Plaintiffs have not made a separate showing as to what costs not taxed by the Clerk of the Court should be reviewed here, and thus, the Court denies the Plaintiffs' motion to the extent it seeks excess costs.

## CONCLUSION

For the foregoing reasons, tthe Plaintiffs' Motion for Prejudgment Interest (**# 140**) is **DENIED**. The Defendants' Motion for New Trial or Remittitur (**# 145**, as amended **# 146**) is **GRANTED IN PART AND DENIED IN PART** as set forth above. The Plaintiffs' Motion for Attorney Fees and Costs (**# 156**) is **GRANTED IN PART**, insofar as the Court awards the Plaintiffs $ 315,358.00 in attorney fees pursuant to 42 U.S.C. § 1988. Judgment consistent with this Order shall enter contemporaneously herein.

Dated this 27th day of August, 2015.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge